## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SALEH ALTAYYAR, MARY M. GILTENAN, and ANDREW HUANG, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>ETSY, INC., CHAD DICKERSON, KRISTINA SALEN, JAMES W. BREYER, M. MICHELE BURNS, JONATHAN D. KLEIN, FRED WILSON, GOLDMAN, SACHS & CO., MORGAN STANLEY & CO., LLC, ALLEN & COMPANY LLC, LOOP CAPITAL MARKETS LLC, and THE WILLIAMS CAPITAL GROUP, L.P.,<br><br>Defendants. | **Case No. 1:15-cv-02785-AMD-RER**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Mary M. Giltenan, along with additional Plaintiffs Saleh Altayyar, and

Andrew Huang (altogether "Plaintiffs"), individually and on behalf of all other persons similarly

situated, by their undersigned attorneys, for their complaint against Defendants, allege the

following based upon personal knowledge as to themselves and their own acts, and information

and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

their attorneys, which included, among other things, interviews of confidential witnesses; review

of the Defendants' public statements, documents, conference calls and announcements made by

Defendants; United States Securities and Exchange Commission ("SEC") filings, wire and press

releases published by and regarding Etsy, Inc., ("Etsy"); analysts' reports and advisories about

Etsy; press coverage regarding Etsy; transcripts of teleconferences regarding Etsy; Etsy's stock

chart; and other pertinent information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class of investors who purchased or otherwise acquired Etsy securities between April 16, 2015, the date of its initial public offering ("IPO") August 4, 2015, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws.

2.      Defendant Etsy, Inc. operates online and offline marketplaces through which its members buy and sell goods, purportedly in three primary categories: handmade items, vintage goods, and craft supplies.  Etsy primarily does so through its website, accessible at www.etsy.com.

3.      To effectuate its IPO, Etsy filed a final prospectus on Form 424B4 with the SEC on April 16, 2015 (the "Prospectus").  The Prospectus was part of a registration statement, filed on Form F-1 with the SEC on March 4, 2015, amended on March 31, 2015 and on April 14, 2015, and declared effective by the SEC on Apr 15, 2015 (the "Registration Statement").

4.      The Prospectus and Registration Statement touted Etsy's "values" and "integrity" and its "authentic, trusted marketplace" that purportedly consisted of individual artisan sellers working only with "responsible, small-batch manufacturing partners" and Etsy-approved "manufacturers who adhere to our ethical expectations."

5.      The Prospectus and Registration Statement also touted Etsy's purportedly strong policies against counterfeit goods and items infringing on the intellectual property of others.  These documents stated that Etsy "use[d] a combination of machine learning, automated systems and community-generated queries and flags to review items and shops that may be in violation of our policies."  They stated, unequivocally, "We have intellectual property complaint and takedown

2

procedures in place to address [the problem], and we believe such procedures are important to promote confidence in our marketplace." They stated that Etsy would "take the appropriate action" as regards potential counterfeits and infringing goods, including "removal of the item from our marketplace and, in certain cases, closing the shops of Etsy sellers who repeatedly violate our policies."

6. In addition, the Prospectus and Registration Statement set forth a host of performance metrics and financial results, including, *inter alia*, Etsy's total membership and its number of "active sellers," as well as its "gross merchandise sales" (or GMS), total revenues and revenues derived from specific segments of Etsy's business model, adjusted EBITDA, cost of revenues, and marketing expense. All of these metrics could, and ultimately would, be impacted by the degree to which Etsy had – or in reality had not – managed the problems of counterfeit and infringing goods listed for sale on its website. To the extent that a heavy volume of counterfeits and infringing items were listed and sold on Etsy's website, then the reported numbers of total members and "active sellers" were inflated, as were the reported figures for GMS, total and segment revenues, and adjusted EBITDA. Conversely, Etsy's reported cost of revenues and marketing expense figures would appear to be lower than what would actually be necessary if Etsy had removed the counterfeiters and intellectual property infringers and their wares.

7. To the outside investor, the Prospectus and Registration Statement made a convincing pitch, painting Etsy as a strong and growing company uniquely positioned in a large niche segment of the online commerce industry, with a sterling reputation and robust policies, mechanisms, and staffing in place to handle the counterfeits and infringing goods that might appear on the Etsy website and thereby ensure that reported operating results and financial performance were legitimate.

3

8.      However, unbeknownst to investors, Etsy had woefully understaffed its anti-fraud efforts, leaving to fifteen or fewer people the task of handling all complaints and performing all random screenings of millions of sales listings by hundreds of thousands of sellers on the Etsy website.  Former Etsy employees from its in-house Integrity Team described their frustration at the "impossible" task of trying to handle the "massive volume" of counterfeiters.

9.      As a result, Etsy relied heavily upon its members to "flag" potential counterfeit or infringing items.  Also undisclosed to investors were the huge array of loopholes and obstacles that permitted counterfeiters and infringers to keep up business as usual – even when their items had been flagged.  For instance, if a counterfeit item was listed as "handmade" or "vintage," it would not be removed.  This exception permitted huge volumes of infringing items to be listed without any fear of removal.  Chinese factories cranking out counterfeit items were permitted to supply Etsy sellers so long as they passed Etsy's "Handmade Inquiry," and thereafter, their products would not be taken down.  Etsy also required intellectual property rights holders to proactively initiate complaints through an onerous process, rather than pre-screening infringing items for potential concerns before permitting them to be listed in the first place.  Even for sophisticated companies, the prospects of keeping pace with the volume of counterfeit and infringing listings on Etsy were daunting.  With items popping up "every minute," it was simply "impossible for the copyright holder to keep up with the entire world."  Etsy also required rights holders to identify the specific item numbers at issue.  If the flagged infringing seller reposted the items using different listing numbers, the rights holder had to start the process all over.

10.      Moreover, Etsy often consciously permitted copyright or infringing items to remain listed, either to keep up appearances and not make its online marketplace look unstable or because

the seller was making Etsy so much money (through the various fees Etsy charged) that its employees were affirmatively instructed to look the other way.

11. Worse still, Etsy had actually disincentivized its employees from being proactive in tracking down and removing counterfeit and infringing items and shops. Etsy had implemented a quota system that rewarded each shutdown of a counterfeit seller's account. However, if an Etsy employee used Etsy's technology to track down and remove associated accounts, such efforts did not 'count' for the quota. As a result, most Etsy employees simply closed the first account identified as belonging to an infringing seller or counterfeiter and moved on, not bothering to dig deeper to find other accounts operated by the same individual. One former Integrity Team member, a lawyer, reported this concern often to Etsy management. That same former employee, over many months, complained about the volume of counterfeit goods being listed. When a new policy was finally implemented in June 2014 banning all counterfeits, Etsy ignored it, permitting counterfeiters to keep their shops open for the sake of making Etsy's market appear stable.

12. There is no question that Etsy's senior management understood the scope of the problems Etsy was experiencing with counterfeit and infringing products and the impact on Etsy's operating results and financial metrics. Among other things, the issue was discussed a companywide meetings, including at least one attended by Defendants Dickerson and Salen, Etsy's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"). In addition, Etsy's Integrity Team authored weekly "fraud reports" detailing its activities, and Etsy as an institution maintained a full repository of all its fraud investigations on a server in New Jersey.

13. Yet, unbeknownst to investors, Defendants took measures to shield rank-and-file employees from knowledge of the counterfeit / infringing products issues, instructing Integrity Team members to refrain from sharing their reports with employees not on their team. When one

former Integrity Agent, who had a publishing background and good training in trademark, grew

dissatisfied with Etsy's laissez-faire approach to infringing products and pressed the issue up the

chain of command, that employee was terminated.

14.     With investors in the dark, Etsy went public on April 16, 2015, its stock soaring out

of the gate from its offering price of $16.00 to a market opening price of $31.00, a high of $35.74,

and a closing price of $30.00.  Defendants reaped huge proceeds from the IPO. Etsy pocketed

$194.2 million in net proceeds.  Various selling stockholders received an aggregate of $87.3

million in net proceeds, of which $39.9 million and $22.5 million, respectively, went to private

equity firms in which Defendants Breyer and Wilson are partners and therefore were paid their

partnership shares.  The Underwriter Defendants (defined *infra*) were compensated an aggregate

of $19.9 million dollars in conjunction with their work on the IPO.

15.     The truth about Etsy's counterfeit and infringing products issues, and the effects on

Etsy's operating performance and financial results was revealed in a series of partial corrective

events, with devastating impact on the Etsy investments of Plaintiffs and the Class.

16.     On May 11, 2015, an analyst report downgraded Etsy in a detailed note stating that

as many as *2 million items* listed for sale on Etsy (*over 5% of all merchandise*) appeared to be

either counterfeit or infringing.  On this news, Etsy's stock dropped $1.86 (8.2%) to close at $20.85

on May 11, 2015.

17.     On May 19, 2015, after hours, Etsy released its Q1 2015 earnings, which analysts

dissected in notes issued on May 20, 2015.  The analysts found correlations between Etsy's

counterfeit and infringing products issues and its troublesome reported operating performance and

financial metrics, such as the potential dilution of Etsy's brand by counterfeit and mass-

manufactured items potentially curtailing listing and revenue growth, the perils of Etsy's reliance

6

on increased marketing spend to prop up results given unaddressed problems with counterfeits and infringing products, and the exacerbation of growth deceleration as Etsy grapples with the impact of mass-manufactured and counterfeit items in its marketplace.  On this news Etsy's stock declined another $3.80 (18.1%) to close at $17.20 on May 20, 2015.

18.     At this point, Defendants Dickerson and Salen attempted to buoy Etsy's stock price with additional false and misleading statements and omissions during an earnings call with analysts on May 20, 2015.  Defendant Dickerson falsely and misleadingly touted Etsy's "industry leading best practices" in combatting infringing products.  He falsely and misleadingly boasted of Etsy's "partner[ing] with major brands," its deployment of a "dedicated legal support team that responds to proper takedown notices by properly removing content," and its actions to "terminate accounts of repeat offenders" and use of "technology to prevent bad actors from returning to our marketplace."  He also stated a false belief that "the facts and the data give us reason to be proud of the work we do to combat infringing materials."

19.     For a time, the tactic worked and Etsy's stock price was buttressed.  However, on August 4, 2015, after hours, Etsy released its Q2 2015 earnings, which were dissected by analysts who once again found correlations between Etsy's counterfeit and infringing products issues and its troublesome reported operating performance and financial metrics.  For example, amid deceleration in active sellers and GMS and increasing marketing spend, analysts again expressed concerns that brand dilution caused by mass-manufactured and counterfeit items would further curtail listing and revenue growth. On this news Etsy's stock price cratered, declining $1.27 (6.2%) to close at $19.23 on August 4, 2015 and declining another $5.45 (28.3%) to close at $13.78 on August 5, 2015.

20.     As a direct and proximate result of Defendants' material misstatements and omissions, and the precipitous decline in the market value of Etsy's securities once their fraud was incrementally revealed, all as discussed in greater detail below, Plaintiffs and other Class members have suffered significant losses and damages as their Etsy investments were devastated.

## JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  The claims asserted herein also arise under and pursuant to §11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §77k, 77l(a)(2), and 77(o)).

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and §27 of the Exchange Act, 15 U.S.C. § 78aa.  It also has jurisdiction over the subject matter of this action pursuant to §22 of the Securities Act, 15 U.S.C. §77v(a).

23.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, §22 of the Securities Act, 15 U.S.C. §77v, and 28 U.S.C. §1391(b), as Defendant Etsy is headquartered in this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District. Moreover, four out of the five Underwriter Defendants - Goldman Sachs & Co., Morgan Stanley & Co., LLC, Allen & Company LLC, and the Williams Capital Group, L.P. – maintain their principal executive offices in New York.

24.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

25.     Lead Plaintiff Mary M. Giltenan, as set forth in her prior-filed Certification (Dkt. No. 14-2), acquired Etsy securities, pursuant and traceable to the Registration Statement and Prospectus and the IPO, at artificially inflated prices during the Class Period, due to the fraud alleged herein, and was damaged upon the revelation of the alleged corrective disclosures as described herein.  Lead Plaintiff resides in New Jersey.

26.     Plaintiff Saleh Altayyar, as set forth in his prior-filed Certification (Dkt. No. 1 at 15-17), acquired Etsy securities, pursuant and traceable to the Registration Statement and Prospectus and the IPO, at artificially inflated prices during the Class Period, due to the fraud alleged herein, and was damaged upon the revelation of the alleged corrective disclosures as described herein.  Plaintiff Altayyar resides in California.

27.     Plaintiff Andrew Huang, as set forth in the attached Certification, acquired Etsy securities, pursuant and traceable to the Registration Statement and Prospectus and the IPO, at artificially inflated prices during the Class Period, due to the fraud alleged herein, and was damaged upon the revelation of the alleged corrective disclosures as described herein.  Plaintiff Huang resides in Texas.

28.     Defendant Etsy, Inc. is a Delaware corporation with its principal executive offices located at 55 Washington Street Suite 512 Brooklyn, NY 11201. Etsy's common stock trades on the NASDAQ under the ticker symbol "ETSY."

29.     Defendant Chad Dickerson ("Dickerson") has served at all relevant times as Etsy's President and CEO (since July 2011), a member of its Board of Directors (since September 2011), and its Chairman (since October 2014).  Defendant Dickerson has a wealth of pertinent technological experience regarding, *inter alia*, Etsy's operations, its receipt of notifications regarding counterfeit and infringing products, its existing capabilities to track and remove

9

offending products and close related seller accounts, its ability to augment existing capabilities to perform those roles better, and its decisions not to do so.  Prior to assuming his roles as President, CEO, Director, and Chairman, Defendant Dickerson was Etsy's Chief Technology Officer from September 2008 until July 2011.  Prior to that, he served in a multitude of high-placed technology-based roles at Yahoo! Inc. from August 2005 through August 2008.  Earlier, he served as Chief Technology Officer at InfoWorld Media Group, Inc., an information online media business, from April 2001 through August 2005.  Earlier still, he worked on early web-based newspapers, like Salon.com, from July 1998 through March 2001.  The Prospectus touts Defendant Dickerson's "extensive experience in media and technology companies" as a reason he should serve on Etsy's Board.  Defendant Dickerson signed and/or authorized the Registration Statement.  Defendant Dickerson had options to acquire over 2 million common shares of Etsy at strike prices between $2.30 and $4.76 that, as a result of the IPO, became far easier to exercise at a profit.  Defendant Dickerson is a resident of New York.

30.     Defendant Kristina Salen ("Salen") has served at all relevant times as Etsy's CFO, assuming that role in January 2013.  Before that, she led the media, Internet, and telecommunications research group of FMR LLC d/b/a Fidelity Investments from January 2006 through January 2013.  Earlier, from 1994 through December 2005, she worked in various financial and executive roles at companies including Oppenheimer Capital LLC, Merrill Lynch & Co., Inc., Lazard Frere & Co. LLC, and SBC Warbarg.  Defendant Salen signed and/or authorized the Registration Statement.  Defendant Salen had options to acquire over 760,000 common shares of Etsy at a strike price of $4.76 that, as a result of the IPO, became far easier to exercise at a profit. Defendant Salen is a resident of New York.

31.     Defendant James W. Breyer ("Breyer") has served at all relevant times as a Director of Etsy.  He has served as a Partner of Accel Partners, a venture capital firm, since 1987 and is the founder and CEO of Breyer Capital, an investment firm, since July 2006.  The Prospectus also touted his service on the boards of a multitude of corporations with highly-valued intellectual property rights and/or significant dealings in safeguarding the intellectual property rights of other rights holders, such as Twenty-First Century Fox, Inc. (from June 2013 onward), online video and publishing platform Brightcove, Inc. (from 2005-2013), News Corporation (from 2011-2013), Wal-Mart (2001-2013), Facebook, Inc. (from 2005-2013), Dell Inc. (from 2009-2013), revenue management solutions provider Model N, Inc. (from 2000-2013), peer-to-peer online credit platform operator Prosper Marketplace, Inc. (from 2005-2012), and Marvel Entertainment, Inc. (from 2006-2009).  The Prospectus said that he should serve on Etsy's Board due to his "extensive experience with retail, media, and technology companies."   Defendant Breyer signed and/or authorized the Registration Statement.  Defendant Breyer also offered to sell 1,237,687 privately held Etsy shares in the IPO on behalf of Accel Partners, in which he is a Managing Director (part of the 1,525,280 total shares that Accel offered to sell in the IPO).  In addition, Defendant Breyer, through entities unaffiliated with Accel, held over 340,000 preferred Etsy shares in series A-1, B, C, D, D-1, and E – the vast majority of which were acquired at prices between $0.3915 and $6.63 per share - all of which converted, on a five-to-one ratio, into common shares as a result of the IPO.  Breyer also held, through entities unaffiliated with Accel, 552,105 preferred shares in series F, acquired for $3.45 per share, which converted on a one-half-to-one ratio, into common shares as a result of the IPO.  Accel held another 3 million preferred shares in series A-1, B, C, D, D-1, and E – the vast majority of which acquired at prices between $0.80 and $6.63 – all of which converted, on a five-to-one ratio, into common shares as a result of the IPO.  Accel also held nearly

5 million preferred shares in series F, acquired at $4.35 per share, which converted, on a one-half-to-one ratio, into common shares as a result of the IPO.  Defendant Breyer is a resident of California.

32.     Defendant M. Michele Burns ("Burns") has served at all relevant times as a Director of Etsy, a role she began in March 2014.  She previously served in high-level executive roles (such as CEO and CFO) at a multitude of companies and firms.  She has also served on the boards of other companies heavily involved in technology and generation and protection of intellectual property, such as Cisco Systems, Inc. (from 2003 onward) and Alexion Pharmaceuticals, Inc. (from July 2014 onward).  She holds a Master of Accountancy degree.  The Prospectus touted her "expertise in corporate finance, accounting and strategy, including experience gained as the chief financial officer of public companies" and her "expertise in global and operational management" as reasons she should serve on Etsy's board.  Defendant Burns signed and/or authorized the Registration Statement.  Defendant Burns had options to acquire over 126,000 common shares of Etsy at a strike price of $10.36 that, as a result of the IPO, became far easier to exercise at a profit.  Defendant Burns is a resident of New York.

33.     Defendant Jonathan D. Klein ("Klein") has served at all relevant times as a Director of Etsy, a role he began in June 2011.  He has extensive experience through involvement in other companies that create and/or safeguard intellectual property.  Since March 1995, he has been co-founder and CEO of Getty Images, Inc., a global media company that, as described in the Prospectus, is "the premier creator and distributor of still imagery and video worldwide."  He has also served on the boards of Squarespace, Inc., a provider of web publishing products and services, since July 2010 and of Real Networks, Inc., a provider of Internet streaming media delivery software and services, from January 2003 through November 2011.  He holds a M.A. in law from

the University of Cambridge.   The Prospectus touted his "extensive experience with communications and media companies" as a reason he should serve on Etsy's Board.  Defendant Klein signed and/or authorized the Registration Statement.   Defendant Klein had options to acquire nearly 25,000 common shares of Etsy at a strike price of $2.30 that, as a result of the IPO, became far easier to exercise at a profit.  Defendant Klein is a resident of New York.

34.   Defendant Fred Wilson ("Wilson") has served at all relevant times as a Director of Etsy, a role he began in October 2014.  He was a founder and has served as Managing Partner of Union Square Ventures since June 2003.  The Prospectus touted his "extensive experience with social media and technology companies" as a reason he should serve on Etsy's Board.  Defendant Wilson signed and/or authorized the Registration Statement.  Defendant Wilson, as beneficial owner, offered to sell 861,231 privately held Etsy shares in the IPO on behalf of Union Square Ventures, an entity in which he is a Partner.  Union Square Ventures held 2.77 million preferred shares in series A-1, B, C, and D – all acquired at prices between $0.3915 and $6.63 – all of which converted, on a five-to-one ratio, into common shares as a result of the IPO.  Union Square also held 1.38 million preferred shares in series F, acquired at $3.45 per share, which converted, on a one-half-to-one ratio, into common shares as a result of the IPO.  Defendant Wilson is a resident of New York.

35.   Defendants Dickerson, Salen, Breyer, Burns, Klein, and Wilson are sometimes referred to herein collectively as the "Individual Defendants."  Each of the Individual Defendants: (a) signed the Registration Statement; (b) directly participated in the management and oversight of Etsy; (c) was directly involved in the day-to-day operations of Etsy at the highest levels; (d) was aware of or deliberately and recklessly disregarded the fact that false and misleading statements were being issued concerning Etsy; (e) was directly or indirectly involved in the

oversight or implementation of Etsy's internal controls and corporate policies; and (f) was directly or indirectly involved in drafting, producing, reviewing, approving, authorizing, disseminating, ratifying and/or making the false and misleading statements and omissions alleged herein, in violation of the federal securities laws.

36.     Defendant Goldman, Sachs & Co. ("Goldman") served as an underwriter and joint book-running manager to Etsy in connection with the IPO. Goldman assisted in drafting and disseminating the Prospectus and Registration Statement and was apportioned 7,350,000 shares of Etsy in the IPO. Goldman maintains its global headquarters in New York.

37.     Defendant Morgan Stanley & Co., LLC ("Morgan Stanley") served as an underwriter and joint book-running manager to Etsy in connection with the IPO. Morgan Stanley assisted in drafting and disseminating the Prospectus and Registration Statement and was apportioned 6,533,332 shares of Etsy in the IPO. Morgan Stanley maintains its global headquarters in New York.

38.     Defendant Allen & Company LLC ("Allen") served as an underwriter and joint book-running manager to Etsy in connection with the IPO. Allen assisted in drafting and disseminating the Prospectus and Registration Statement and was apportioned 2,450,000 shares of Etsy in the IPO. Allen maintains its global headquarters in New York.

39.     Defendant Loop Capital Markets LLC ("Loop") served as an underwriter and joint book-running manager to Etsy in connection with the IPO. Loop assisted in drafting and disseminating the Prospectus and Registration Statement and was apportioned 166,667 shares of Etsy in the IPO. Loop maintains its global headquarters in Illinois.

40.     Defendant The Williams Capital Group, L.P. ("Williams") served as an underwriter and joint book-running manager to Etsy in connection with the IPO. Williams assisted in drafting

and disseminating the Prospectus and Registration Statement and was apportioned 166,667 shares of Etsy in the IPO.  Williams maintains its global headquarters in New York.

41.      Defendants Goldman, Morgan Stanley, Allen, Loop, and Williams are sometimes referred to herein collectively as the "Underwriter Defendants."  The Underwriter Defendants: (a) were collectively compensated nearly $20 8 million for their work on the IPO, after exercising their option to sell Etsy stock in the IPO; (b) increased interest in the IPO by organizing a multi-city, pre-IPO roadshow with potential investors to present them with information about Etsy, its business, operations, and financial prospects; (c) undertook a due diligence investigation of Etsy's business and operations in order to effectuate the IPO, during which they were privy to confidential information regarding Etsy, its business, operations, and financial prospects; (d) consulted on a consistent and continuous pre-IPO basis with Etsy lawyers, top executives, management, and directors to draft the Prospectus and Registration Statement, during which consultations they discussed, *inter alia*, the language and wording to be used in the Prospectus and Registration Statement, the disclosures to be made therein, the omissions to be excluded therefrom, and how Etsy would respond to SEC comments when it reviewed the Prospectus and Registration Statement; and (e) caused the Prospectus and Registration Statement to be filed with the SEC and declared effective in connection with offers and sales of Etsy stock, including to Plaintiffs and the other Class members.

## NON-PARTY CONFIDENTIAL WITNESSES

42.      CW1, a lawyer, was an Integrity Agent at Etsy from October 2013 to August 2014 and, during that time, reported to Sarah Abramson, the Manager of Marketplace Integrity at that time.  According to CW1, Ms. Abramson reported to Corinne Haxton Pavlovic, the Director of Trust and Safety, who in term reported to Heather Jassy, the Senior Vice President of Members and Community.  CW1 stated that Ms. Jassy oversaw Member Services, including the "Trust and

Safety Team," was Defendant Dickerson's "right-hand woman" and communicated regularly with Defendant Salen. CW1's job duties included, *inter alia*, responding to Etsy items or sellers that might be problematic and that were "flagged" either by members or by Integrity team sweeps. CW1's tenure coincided with the time periods of Etsy's operations and financial performance that were reported within the Prospectus and Registration Statement.

43.  CW2 worked as an Etsy Marketplace Integrity Agent from August 2014 to January 2015, reporting to Marketplace Integrity Manager Anthony Marino. CW2's job duties included, *inter alia*, identifying and mitigating violations of Etsy's seller policies limiting what can be sold on its website. CW2's tenure coincided with the time periods of Etsy's operations and financial performance that were reported within the Prospectus and Registration Statement.

44.  CW3 was a Member Advisor for Etsy in its Hudson, New York office from September 2013 to August 2014, who reported to the Manager of General Support Jed Thorn. CW3's job responsibilities included receiving and responding to email inquiries from Etsy users, at the rate of roughly 100 per day, including email inquiries or complaint about counterfeit items or infringements on trademarks or copyrights. CW3's tenure coincided with the time periods of Etsy's operations and financial performance that were reported within the Prospectus and Registration Statement.

45.  CW4 worked as Etsy's Chief Marketing Officer from January 2014 to July 2014, reporting directly to Defendant Dickerson. CW4's tenure coincided with the time periods of Etsy's operations and financial performance that were reported within the Prospectus and Registration Statement.

46.  CW5 was a Risk Operations Agent at Etsy from December 2013 until May 2015. CW5's job responsibilities entailed, *inter alia*, handling credit card disputes and fraud regarding

payments.  CW5's tenure coincided with the time periods of Etsy's operations and financial performance that were reported within the Prospectus and Registration Statement.

47.     CW6 worked as a Data Analyst at Etsy from January 2013 to January 2015, reporting to Nell Thomas, Senior Director, Analytics & Business Intelligence.  CW6's tenure coincided with the time periods of Etsy's operations and financial performance that were reported within the Prospectus and Registration Statement.

## SUBSTANTIVE ALLEGATIONS
### Etsy's Business Model

48.     Defendant Etsy was founded in 2005 and is headquartered in Brooklyn, New York. Its shares trade on the NASDAQ under the ticker symbol "ETSY."  It has additional offices in Berlin, Germany; Dublin, Ireland; Hudson, New York; London, United Kingdom; Melbourne, Australia; Paris, France; San Francisco, California; and Toronto, Canada.

49.     Etsy operates online and offline marketplaces connecting buyers and sellers of merchandise falling into any of three specific purported categories:  handmade goods, vintage goods, and craft supplies.  Its online platform, operated through the website accessible via the URL www.etsy.com, connects buyers and sellers from all over the world.

50.     As Etsy's website stated on the day before its IPO:

Etsy is a marketplace where people around the world connect, both online and offline, to make, sell and buy unique goods.  The heart and soul of Etsy is our global community: the creative entrepreneurs who use Etsy to sell what they make or curate, the shoppers looking for things they can't find anywhere else, the manufacturers who partner with Etsy sellers to help them grow, and the Etsy employees to maintain and nurture our marketplace.

51.     The Prospectus touted Etsy's market penetration and the scope of its online platform, asserting that as of December 31, 2014, Etsy had connected 54.0 million members, including 1.4 million active sellers and 19.8 million active buyers, in nearly every country in the

world.  Etsy's website as of the IPO touted these same figures, adding that Etsy then had 29 million items listed for sale.

52.     Etsy makes money from fees it charges its sellers, as described in the Prospectus:

Our business model is based on shared success:  we make money when Etsy sellers make money.  Our revenue is diversified, generated from a mix of marketplace activities and services we provide Etsy sellers to help them create and grow their businesses.  Marketplace revenue includes the fee an Etsy seller pays for each completed transaction and the listing fee an Etsy seller pays for each item she lists. Seller Services revenue includes fees an Etsy seller pays for services such as prominent placement in search results via Promoted Listings, payment processing via Direct Checkout and purchases of shipping labels through our platform via Shipping Labels.  Other revenue includes the fees we receive from a third-party payment processor.

53.     Not surprisingly, Etsy's Prospectus listed as one of the "Key Factors Affecting Our Performance" the "Growth and Retention of Active Sellers and Active Buyers," explaining:

Our success depends in part on the growth and retention of our active sellers and active buyers.  Our revenue is driven by the number of active sellers, seller engagement, the number of active buyers, buyer engagement and our ability to maintain an authentic, trusted marketplace. … To analyze our retention rates, we measure repeat activity by our members.

54.     To attract investors to its IPO, Etsy needed to portray its marketplace as authentic and trustworthy, its efforts at combatting counterfeits and infringing products as significant and effective, and its operating results and financial metrics as legitimate and sustainable.

### Etsy's Corporate Policies and Risk Oversight

55.     As of its IPO, Etsy's website touted its robust ethical standards and stringent prohibitions on the sale of goods that were counterfeit or infringed upon intellectual property rights.  For instance, Etsy's Terms of Use as of its IPO stated, in a section captioned "Prohibited, Questionable, and Infringing Items and Activities" in relevant part as follows:[1]

Restricted Activities:  ***Your Content and your use of Etsy shall not***: …

---

[1] All bolded, italicized language within quoted materials herein had emphasis added unless otherwise noted.

2.  ***Be fraudulent or involve the sale of illegal***, ***counterfeit*** or stolen ***items***

3.  ***Infringe upon any third-party's copyright, patent, trademark, trade secret or other proprietary or intellectual property rights*** or rights of publicity or privacy (see also, Etsy's Copyright and Intellectual Property Policy)

4.  ***Violate this Agreement, Etsy Guidelines, Seller Guidelines, any site policy or community guidelines, or any applicable law, statute, ordinance or regulation***…

56.     Similarly, Etsy's website was also very clear as to the permitted categories of goods

for sale.  Etsy's Guidelines, as posted on its website, stated in relevant part:

Everything on Etsy must be Handmade, Vintage, or a Craft Supply

*Handmade* items are designed and created by the shops that sell them.  …  Reselling an item you were not involved in creating is not allowed in our handmade category.

*Vintage* items must be at least 20 years old.

*Craft supplies* are tools, ingredients, or materials intended for use in the creation of a new handmade item.  Commercially made materials that are not ready to use as finished goods may not be sold as craft supplies on Etsy.

Prohibited items, services, and ***items that violate our intellectual property policies are not allowed on Etsy***.

57.     Etsy's website also set forth a Copyright and Intellectual Property Policy that

promised action to combat copyright and intellectual property infringement both in response to

notices by copyright holders and on Etsy's own initiative.  That policy stated, in relevant part:

Etsy, Inc. ("Etsy") has adopted the following general policy toward copyright and intellectual property infringement in accordance with general U.S. intellectual property laws and the Digital Millennium Copyright Act (http://lcweb.loc.gov/copyright/legislation/dmca.pdf).  Etsy will respond to notices of this form from jurisdiction other than the U.S. as well.  …

***Etsy may act expeditiously to respond to a proper notice by (1) removing or disabling access to material claimed to be subject (sic) of infringing activity; and (2) removing and discontinuing service to repeat offenders***.  …

***Repeat offenders will have all material removed from the system and Etsy will terminate such Members' access to the service***.  …

19

58.     The Prospectus described the role of Etsy's Board, including the Individual Defendants, in overseeing its risk management and ensuring compliance with its corporate policies, stating:

> One of the key functions of our board of directors is informed oversight of our risk management process.  In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure, and our executive officers are responsible for the day-to-day management of the material risks we face.  Our board of directors administers its oversight function directly as a whole and through its standing committees.

59.     The Prospectus listed Defendants Burns (as chair), Klein and Wilson as members of the Board's Audit Committee after the IPO, stating that each of them "can read and understand fundamental financial statements."  Its role is to assist Etsy's Board oversight of, among other things, "the integrity of our financial statements, our compliance with legal and regulatory requirements" and "the design and implementation of our internal audit function and risk assessment and risk management."  It also "is responsible for reviewing and discussing with our management the adequacy and effectiveness of our disclosure controls and procedures."

## Undisclosed Negative Facts About Etsy's Business

### *Etsy Imposed No Initial Barrier To The Listing Of Counterfeit And Infringing Goods*

60.     CW2 confirmed that Etsy had no initial vetting process in place requiring sellers to prove that their products met Etsy's policies of being handmade/vintage/craft supplies and of not being counterfeit/infringing before listing them for sale on the site.  As CW2 stated, "The sellers are not approved prior to them going live."  Absent such a process, sellers could and did freely set up shops and list products for sale that clearly violated Etsy's policies, including counterfeit goods and items violating intellectual property rights in direct violation of Etsy's Terms of Use, Guidelines, and policies.

20

61.    Instead, Etsy relied on its employees to work after-the-fact to try to identify and catch the violators, while imposing significant loopholes, obstacles, and hindrances to their ability to actually do so, according to CW2 and the other CWs as described below.

### Etsy Woefully Understaffed Its Internal Efforts To Identify Counterfeit And Infringing Goods And Sellers

62.    CW1 stated that Etsy's Member Services department oversaw the "Trust and Safety Team," which had responsibility for dealing with a variety of fraudulent activities and violations of Etsy's corporate policies.  Per CW1 and CW5, the Trust and Safety Team had three subgroups: Integrity, Trust, and Risk.  CW2 corroborated that the Integrity Agents fell under the umbrella of the Trust and Safety Team, which was responsible for identifying and mitigating all forms of policy violations as well as illegal and fraudulent activity.

63.    CW1 and CW2 both stated that the Integrity team was responsible for: (a) enforcing Etsy's policy that all items for sale on its platform must be handmade, vintage (at least 20 years old), or craft supplies and (b) finding and removing counterfeit items from Etsy's website.   CW5 corroborated that the Marketplace Integrity Team policed Etsy's website to make sure shops were in compliance with Etsy's policies and procedures.

64.    However, despite its important duties, numerous CW's establish that the Integrity team was horribly understaffed.  Multiple CW's pegged the size of the Integrity Team consistently: CW1 said the Integrity Team consisted of between eight and twelve people during CW1's tenure; CW2 said it had only 10 total people during CW2's tenure; while CW5 said that it had between 10 and 15 members during CW5's tenure.  Similarly, CW3 put the membership of the entire "Trust Team" (of which the Integrity Team was just one part) in Etsy's Hudson, New York office at 20 people in September 2013.  CW3 said that Etsy grew the size of the "Trust Team" to 75 people in the Hudson, New York office during her tenure, meaning that as Etsy's IPO neared, nearly three-

quarters its membership was relatively new employees.

65.     This small staff was responsible for handling all complaints of counterfeit or infringing goods and investigating to determine if Etsy's sellers were abiding by the policy that all items had to be handmade, vintage or craft supplies.  Not surprisingly, its members described frustration at an inability to tackle such a huge problem with such little staffing.  CW1 stated, "We were the only ones dealing with the entire site" at a time when Etsy had hundreds of thousands of seller shops, each potentially with hundreds of items for sale.  According to CW1, "We were dealing with many thousands of counterfeit sellers."  Added CW2, "You can only keep up so quickly on it.  With that many people over different time zones and that kind of massive volume. They did the best they could to get on top of things as quickly as possible, but unfortunately the pure volume of it was very challenging."

### Etsy Instead Put The Onus On
### Non-Violating Members And Intellectual Property Rights Holders

66.     Etsy therefore substantially relied upon its members to raise concerns about any counterfeit goods or items infringing on the trademark, patent, or copyright rights of others.  CW3, an Etsy Member Advisor, corroborated that Etsy relied a great deal on its member community to report problematic items and sellers.

67.     CW1, as an Integrity Team member, stated that Etsy items or sellers were "flagged" by other Etsy members or internally through "sweeps" conducted by Integrity Team members. The sweeps that CW1 conducted involved searching Etsy for popular items that tended to attract counterfeiters.  If an item was "flagged" as potentially counterfeit, CW1 would review the item's posted page for indications that it might indeed be counterfeit.  When an obviously counterfeit item was listed, *e.g.*, a supposedly new Hermes Birkin handbag for $500 with 500 units available

(when a real one costs between $10,000 and $90,000), the Integrity Team could theoretically shut down that account.

68.     However, CW1 stated that not all counterfeit items were removed from Etsy.  If a seller's products passed Etsy's test for classification as "handmade" or "vintage," the offending products were not removed even if they were likely a counterfeit.  For instance, CW1 recalled iPhone cases with the designer brand Chanel's single letter "C" were a popular item on Etsy; many were likely counterfeit and usually the sellers were Chinese factories.  Because those factories had passed Etsy's "Handmade Inquiry" (or HMI) investigations by the Integrity Team, they were allowed to continue selling the purported "Chanel" iPhone cases even though the product was likely a counterfeit.  This approach ran counter to Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy.

69.     CW1 stated that Etsy's policy was that if the trademark or copyright holder, *e.g.*, Chanel, did not submit a formal complaint to Etsy's legal department and request removal of the counterfeit item, Etsy's stance was that it had no responsibility to do anything further.  CW1 observed that certain companies, *e.g.*, Chanel, had counterfeit items up "all the time" but seemed to never enforce their copyright.

70.     CW1 also said that even for companies that enforced their intellectual property rights, the task of keeping up with and demanding removal of counterfeit items posted on Etsy was monumental.  "Popular items would pop up every minute.  The copyright holder would not be able to pick up on all of them.  It's impossible for the copyright holder to keep up with the entire world."

71.     In early 2014, CW1 recalled an Integrity Team presentation, given by Senior Integrity Analyst Kaycie Hall, at Etsy's monthly "Lunch & Learn" event, to which all employees, including Defendants Dickerson and Salen, would have received invitations.  The discussion

23

included how the Integrity Team handled counterfeit items, at a time when their sale was permitted so long as such items were classified as handmade or vintage.

72.     CW1 stated that Etsy dealt with trademark violations in a similar way.  Etsy did not believe it was responsible for enforcing trademarks unless the rights holder demanded removal of the items in question.  As long as the items were classified as handmade or vintage, the seller was allowed to sell products making use of any type of trademark.  As CW1 put it, "We don't do anything with that.  We just let them continue on the site."  For example, products from the Disney animated movie Frozen were very popular, so much so that tens of thousands of Frozen costumes, beach towels, bed sheets, etc. were being sold on Etsy.  So long as the seller's Frozen items were classified as handmade, Etsy left them alone.  This approach ran counter to Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy.

73.     According to CW1, if Etsy received an email complaint about an item, alleging that it was in violation of a trademark, Etsy responded with a prepopulated email indicating that Etsy had no control over such items unless it was the holder of the copyright, patent, or trademark who was contacting, and in that case, the complainer was directed to the Legal Department and asked to provide documentation substantiating that they held the rights and the item was unauthorized.

74.     However, this process was onerous.  In their request, the rights holder had to identify, by item number, each and every product that was unauthorized.  CW1 indicated that, just like with counterfeit items, this could be an insurmountable task.  Even if the rights holder identified 50 sellers selling unauthorized trademarked products, Etsy would remove only the specific products that the rights holder identified by item number.  If another 50 sellers, or even the original 50 sellers, began using new item numbers to sell the exact same product that was previously removed as unauthorized under a different number, the rights holder would have to go

through the entire process again, identifying each new unauthorized item by number before Etsy would remove it. Only after any given seller was caught violating trademarks three times would that seller's account was closed.

75.     Moreover CW2 stated that if a seller had 50 items listed that violated a trademark and all 50 were removed after the trademark holder filed a complaint, it would only count as one report. In other words, that seller was free to commit another trademark violation without risking removal of its seller account under Etsy's effective three-strikes approach.

76.     CW2 corroborated that trademark holders were required to submit proof to Etsy's legal department that goods violated trademark before Etsy would remove them. Indeed, CW2 said that the Integrity Agents were not allowed to remove items for suspected trademark violations unless or until the legal department ordered it. CW2 also corroborated that unless a trademark holder complained or demanded removal, items in violation of trademark would remain on Etsy. In other words, Etsy's policies presumed validity and permitted listing by default. This approach ran counter to Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy.

77.     CW1 also stated that Etsy permitted items like Frozen products to be sold on its website even though they likely violated its policy of being handmade, because taking those items down or freezing the sellers' shops would look bad for Etsy. As CW1 stated, "People are selling lots of Frozen mass produced items and if you just shut these shops down, with all these mom buyers wanting to buy their kids Frozen stuff, it just doesn't look good."

### Etsy Disincentivized Its Employees From Cracking Down

78.     Individual sellers on Etsy could have multiple accounts, *e.g.* if they linked them to different email addresses. CW1 said that the back end of Etsy's website allowed Integrity Team members to review and compare identifying information (*e.g.*, IP address, address, name, credit

card, email address) so as to identify and close any other accounts associated with a seller whose items were deemed to be counterfeit and whose offending account was closed.  However, sometimes the links were not obvious.  Many counterfeit sellers operated out of proxy IP addresses, used multiple email addresses and different credit card numbers.

79.    CW1 stated that CW1 looked deeper and spent more time cross-referencing information to find additional accounts set up by counterfeit sellers.  However, none of CW1's colleagues took such additional steps.  CW1's frustration was clear:  "What I would do, not everybody on my team would do this.  This is why it was frustrating, and I often reported it to management.  I would look at every single related account manually to see what they were selling and see if they needed to be frozen.  I think I was the only person on my team that was doing that.  They were just shutting one shop and moving on."

80.    CW1 stated that Etsy's quota system for Integrity Team members was a disincentive to spend the extra time to locate and freeze additional accounts associated with a single counterfeit seller.  Each Integrity Team member was required to complete a specific number of "ticks," or investigations of flagged items each day.  Their job performance was graded on how well they were able to meet the numerical quotas.  If an Integrity Team member shut down one account run by a counterfeit seller, that counted as one "tick."  However, if that Integrity Team member spent additional time trying to locate associated accounts also run by that counterfeit seller, it would not count as additional "ticks" and would not count toward the numerical quota, no matter how many other accounts were identified and closed.  Thus, there simply was no incentive to do so.

81.    CW1 also recalled that a number of large sellers, who earned Etsy a lot of money and brought publicity to its website, were allowed to continue selling even if they did not meet

26

company policy regarding their products.  For instance, CW1 recalled the shop "Three Bird Nest," which was allowed to sell its leg warmers and headbands, even those the shop owner was buying them whole sale from a factory, a fact that would disqualify its goods from being considered handmade or vintage.  However, as CW1 said, Three Bird Nest was making Etsy so much money, it was allowed to continue selling.  As CW1 stated, "Apparently they didn't really pass the Handmade Inquiries.  But they made Etsy so much money, we were told, 'Don't mess with that shop.'  A lot of shops that made a lot of money, high profile shops in the news all the time that weren't actually complying, because they brought so much in business, you couldn't get rid of those shops."  This approach was counter to Etsy's Terms of Use, Guidelines, and policies.

### Amid Growing Employee Frustration, Defendants' Knowledge Is Clear

82.     In this context, multiple CWs described their frustrations at the way Etsy handled – or failed to handle – counterfeit and infringing items and sellers.

83.     After working at Etsy for just a few months, CW2 became frustrated by Etsy's response to counterfeit goods and trademark violations on its website.  CW2 thought that Etsy should require sellers to prove that their products met the company's policies and were not counterfeit or otherwise in violation of the intellectual property rights of others *prior* to letting them sell any items on the website.  CW2 found that relying on a small staff to identify and remedy violations after-the-fact was frustrating.  CW2 stated, "Unfortunately, I think the work load was more than we could handle" and "I think there were a lot of overwhelmed people.  It was a hard job.  It was a lot for the small team that it was."

84.     CW3 grew frustrated with the lack of clarity as to how to handle complaints about counterfeit and infringing items.  As a Member Advisor, CW3 received 100 emails per day from Etsy users, including inquiries or complaints about counterfeit items or items infringing on trademarks or copyrights.  The protocol was for CW3 to forward such inquiries or complaints to

the Etsy Legal Department and/or Etsy's "Trust Team." However, Etsy changed which department dealt with which problems so frequently that CW3 grew frustrated and could not keep track of where to forward complaints.

85.     CW1, a lawyer, did not think Etsy should allow counterfeit goods to be sold on its website, so CW1 complained to CW1's boss, Sarah Abramson, and also to Ms. Abramson's boss, Corinne Haxton Pavlovic, about this issue after encountering it so often. CW1 stated that CW1 had a "fair amount of conversations" over "months and months" before a new policy was created. That policy, which went into effect in June 2014, purportedly banned all counterfeit goods on the site, regardless of whether the seller's items were classified as handmade or vintage. CW1 recalls company emails sent out announcing the new policy and believes that Bonnie Broeren, Etsy's Head of Policy, signed them.

86.     However, notwithstanding this new policy, CW1 stated that Etsy regularly allowed individual sellers to continue selling counterfeit goods because freezing shops all the time created the impression in buyers' minds that the products on the site may not be legitimate. As CW1 put it, "They didn't want to shut their (counterfeit) shops down right away because it looks bad. If a seller opens one day and is shut down the next day, it makes the market look unstable." This approach was counter to Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy.

87.     In addition to CW1's complaints, there is substantial evidence that the Individual Defendants and senior management at Etsy knew the scope of its problems with counterfeit and infringing products.

88.     CW6 recalled that Etsy's top executives were aware of the counterfeit and trademark infringement problem by at least early 2013, because it was discussed at a companywide

meeting at that time, attended by Defendants Dickerson and Salen, held to discuss new policies that would expand allowance of more manufactured goods on the Etsy website.  CW6 recalled company employees discussing the problems of counterfeit items and trademark violations on the Etsy website and how expanding allowance of manufactured goods on Etsy might impact that problem.  CW6 also recalled other meetings at which counterfeit items and trademark violations were discussed.

89.     CW4, Etsy's Chief Marketing Officer who reported directly to Defendant Dickerson, said that Dickerson was aware of the counterfeit goods and unauthorized trademark items being sold on Etsy.  CW4 also recalled the topic being discussed during meetings with colleagues.

90.     According to CW1, each week, a different Integrity Team member wrote a "fraud report" about the group's activities, collecting anecdotal information from the other team members about cases and tips on what to look for that might indicate fraudulent activities.  CW1 knows that the reports were provided to Sarah Abramson and Corinne Haxton Pavlovic.  CW2 corroborates that the Integrity Team prepared weekly reports showing the results of the work by Integrity Agents, including, *inter alia*, details like how many accounts were shut down due to counterfeit goods, how many were shut down because goods were not handmade, and how many were shut down by automated programs.

91.     Institutionally, Etsy maintained a full repository of all of its fraud investigations. Specifically, CW1 stated that an Etsy server in New Jersey maintained digital records of all files for the investigations conducted by the Integrity Team.  On information and belief, this repository remained accessible to Defendants, including the Underwriter Defendants, throughout their work leading up to Etsy's IPO and in the months after Etsy went public.

92.     However, Defendants took measures to shield Etsy rank-and-file employees from knowledge about its ongoing fraud problems.  CW1 said that CW1 and the other Integrity Team members were told not to share the fraud reports with other employees not on their team. According to CW1, "We didn't pass them out to the company.  We didn't tell people in the company.  In fact, we were supposed to not tell people what was going on, like fraudulent behavior."

93.     CW1 stated that Heather Jassey, Senior Vice President of Member Services and Defendant Dickerson's "right hand woman" who also worked directly with Defendant Salen, was involved in all aspects of the business, including the Trust and Safety team, which was under her responsibility.  CW1 stated, "We had direct access to Heather, and Heather, she was very much in everyone's business."   CW1 believes Ms. Jassy knew of the extent of counterfeit items and trademark violations on Etsy.

94.     Indeed, CW2 said that during CW2's tenure at Etsy, it considered implementing a vetting process for sellers that would review products prior to allowing them for sale on its website. CW2 said meetings attended by senior executives were held to discuss the vetting process and was "pretty sure" that Defendants Dickerson and Salen were aware of and part of the discussions about it.  CW2 recounted work by policy and legal personnel to consider changes, but described it as "a very cumbersome process" over a "few months."  CW2's boss and Etsy software engineers gave CW2 the impression that a vetting process would have required a substantial amount of work and time, involving a lot of changes to the Etsy website platform itself, which had not been set up to vet sellers.

95.     CW2 also indicated that the Integrity Agents and their manager requested additional help, due to the volume, and that "it was widely known that more people were needed."  CW2

30

believed senior executives were "aware that there were changes that needed to happen," both in terms of adding more staff and implementing a vetting process to better deal with violations of Etsy's policies and counterfeit items.

96.     CW2 felt that Etsy's stance that it was not responsible for items listed for sale on its website in violation of intellectual property rights was not a "viable response."  CW2 was not satisfied with Etsy's response to the high number of counterfeit goods and items that violated intellectual property rights for sale on its website.  CW2 pressed the issue with CW2's boss and asked questions about what Etsy was doing to address the problems better.  The response?  According to CW2, it was termination of employment.  Said CW2, "I did feel frustrated.  And I was let go because I was asking a lot of questions. Quite frankly, I come from a publishing background and I'm very highly trained in trademark.  I was concerned about the counterfeit and trademark issues."

97.     All of the foregoing facts and circumstances set forth within this Section of this Amended Class Action Complaint were omitted and/or affirmatively misrepresented in the Prospectus and Registration Statement and were not disclosed to Etsy's investors.

**Etsy's Initial Public Offering**

98.     On April 16, 2015, Etsy went public in its IPO.

99.     To effectuate its IPO, Etsy filed the Prospectus with the SEC on April 16, 2015. The Prospectus was part of the Registration Statement signed by Defendants Dickerson and Salen, and, through Defendant Salen acting as their Attorney-in-Fact, by Defendants Breyer, Burns, Klein, and Wilson.  The Registration Statement was filed on Form F-1 with the SEC on March 4, 2015, amended on March 31, 2015 and on April 14, 2015, and declared effective by the SEC on April 15, 2015.

100.    Per the Registration Statement and Prospectus, Etsy offered 13,333,333 shares of common stock to be sold in the IPO, while the "Selling Stockholders" identified therein offered an additional 3,333,333 shares of Etsy common stock, retaining for themselves the proceeds from their sale.   Specifically, Accel Partners and its affiliates (including Breyer Capital) offered 1,525,280 million shares (the majority of which were listed as beneficially owned by Defendant Breyer), while Union Square Ventures and its affiliates offered 861,231 shares (listed as beneficially owned by Defendant Wilson).   In addition, the Underwriters retained an option to purchase 2,499,999 shares from the Selling Stockholders, which they did, from which sales the Selling Stockholders also retained the proceeds.

101.    Per the Prospectus, "[p]rior to this offering there has been no public market for the common stock."   Thus, the IPO was Etsy's and the Selling Stockholder's first opportunity to monetize their company equity through the public markets.   As described in the Prospectus, the Selling Stockholders had become equity holders in Etsy through a series of preferred stock purchases, including back in May 2012, when:

(a)    Etsy sold an aggregate of 11,594,203 shares of Series F preferred stock at a purchase price of $3.45 per share to investors including, *inter alia*: (i) Accel Partners and its affiliates, in which Defendant Breyer is a Partner (4,968,944 Series F shares, bought for $17.1 million); (ii) Breyer Capital, in which Defendant Breyer is founder and CEO (552,105 Series F shares, bought for $1.9 million); (iii) Union Square Ventures, in which Defendant Wilson is a Partner (1,380,262 Series  F shares, bought for $4.7 million); and

(b)    Etsy, via a letter agreement, permitted a tender offer in which Defendant Dickerson and other Etsy executives, among others, tendered an aggregate of 2,144,881 shares of Etsy capital stock (including preferred stock on an as-converted basis) sold at a price of $6.90 per share, out of

which: (i) Accel Partners purchased 919,510 shares for an aggregate price of $6.2 million; (ii) a Union Square Ventures fund purchased 255,241 shares for an aggregate price of $1.7 million; and (iii) Breyer Capital L.L.C. purchased 102,096 shares for an aggregate price of over $697,000.

102.    As described *supra*, through the IPO, Defendants Breyer and Wilson, and the investment firms with which they are affiliated, benefitted by having their preferred Etsy shares converted into common stock that is liquid and can be sold in open market transactions.

103.    As also described *supra*, through the IPO, Defendants Dickerson, Salen, Burns, and Klein benefited by having a public float of Etsy common stock trading on NASDAQ, thereby making it more likely that they could exercise their options to acquire common shares at advantageous times for profit.

104.    As described in the Registration Statement, Etsy expected to receive $194.2 million in proceeds from the IPO, after deducting underwriting discounts and commissions and estimated offering expenses.  Etsy listed a multitude of important corporate benefits to be achieved through the IPO, including its goals to "increase our visibility, create a public market for our common stock and facilitate our future access to the public equity markets."   In addition to investing in and growing its business, Etsy stated that it might use a portion of the IPO proceeds "to fund the build-out of our new corporate headquarters" and to fund "acquisitions of other complementary businesses, technologies, or other assets."

105.    As its IPO launched, Etsy's stock price soared well above its $16.00 offering price. Its opening price on April 16, 2015 was $31.00, and after reaching a high of $35.74, it closed at $30.00 that day.

106.    As later confirmed in its Form 10-Q for Q1 2015, filed with the SEC on May 22, 2015 (the "Q1 2015 10-Q"), Etsy closed its IPO with 19,166,665 shares of common stock sold to

investors, including 13,333,333 shares sold by Etsy and 5,833,332 shares sold by the Selling Stock (the 3,333,333 originally offered by them plus the 2,499,999 sold at the underwriters' option). The Q1 2015 10-Q confirmed that the aggregate offering price for these shares sold in Etsy's IPO was $306.7 million. Etsy secured the expected $194.2 million in net proceeds from the sale of its 13,333,333 million shares, net of the underwrite discount of $1.04 per share ($13.9 million total) and offering expenses of $5.2 million.

107.    According to Form 4 filings made after the IPO, the Selling Stockholders secured an aggregate of $87,266,646 in net proceeds from the sale of their 5,833,332 shares. Of that amount, Accel received $39,931,800 on sale of 2,669,238 shares (2,165,950 of which were beneficially owned by Defendant Breyer) and Union Square received $22,547,024 on the sale of 1,507,154 shares (all beneficially owned by Defendant Wilson). All these amounts were reflective of the $16.00 per share offering prices less the $1.04 per share underwriter discount.

108.    Through closing the IPO, the Underwriter Defendants were compensated an aggregate of $19.9 million dollars, derived from the $1.04 underwriter discount (inclusive of certain fees) on all 19,166,665 shares offered in the IPO.

**Key Defined Terms And Metrics From Etsy's Prospectus**

109.    The Prospectus defined an "active sellers" as follows:

An active seller is an Etsy seller who has incurred at least one charge from us in the last 12 months. Charges include transaction fees, listing fees and fees for Direct Checkout, Promoted Listings, Shipping Labels and Wholesale enrollment. An Etsy seller is a member who has created an account and has listed an item in our marketplace. An Etsy seller is identified by a unique e-mail address; a single person can have multiple Etsy seller accounts. We succeed when Etsy sellers succeed, so we view the number of active sellers as a key indicator of the awareness of our brand, the reach of our platform, the potential for growth in GMS and revenue and the health of our ecosystem.

110.    The Prospectus defined "GMS" in relevant part as follows:

34

Gross merchandise sales, or GMS, is the dollar value of items sold in our marketplace within the applicable period, excluding shipping fees and net of refunds associated with cancelled transactions. GMS does not represent revenue earned by us. GMS relates only to Marketplace activity and does not reflect Seller Services activity. However, because our revenue and cost of revenue depend significantly on the dollar value of items sold in our marketplace, we believe that GMS is an indicator of the success of Etsy sellers, the satisfaction of Etsy buyers, the health of our ecosystem and the scale and growth of our business.

111.    The Prospectus defined "Adjusted EBITDA" as follows:

Adjusted EBITDA represents our net (loss) income before interest expense, net, (benefit) provision for income taxes and depreciation and amortization, adjusted to eliminate stock-based compensation expense, net unrealized loss on warrant and other liabilities, foreign exchange loss and acquisition-related expenses. … We have included Adjusted EBITDA in this prospectus because it is a key measure used by our management and board of directors to understand and evaluate our operating performance and trends, allocate internal resources, prepare and approve our annual budget, develop short- and long-term operating plans and assess the health of our ecosystem. As our Adjusted EBITDA increases, we are able to invest more resources in our community. We also believe that Adjusted EBITDA provides a useful measure for period-to-period comparisons of our business as it removes the impact of non-cash items and certain variable charges. …

112.    The Prospectus explains in detail the components of Etsy's revenue:

Our revenue consists of Marketplace revenue, Seller Services revenue and Other revenue.

*Marketplace revenue*.  Marketplace revenue consists of the 3.5% fee that an Etsy seller pays for each completed transaction on our platform, exclusive of shipping fees charged. Marketplace revenue also consists of a listing fee of $0.20 per item that she lists (for up to four months) in our marketplace. Although revenue from completed Wholesale transactions is included in Marketplace revenue, revenue from Wholesale enrollment is included in Seller Services revenue. Transaction fees are recognized when the corresponding transaction is made. Listing fees are recognized ratably over a four-month listing period, unless the item is sold or the seller relists it, at which time any remaining listing fee is recognized.

*Seller Services revenue*.  Seller Services revenue consists of fees an Etsy seller pays us for the Seller Services she uses, including Promoted Listings, Direct Checkout, Shipping Labels, and Wholesale.

•       Revenue from Promoted Listings consists of cost-per-click based fees an Etsy seller pays us for prominent placement of her listings in search results

35

generated by Etsy buyers in our marketplace.  Revenue is recognized when the Promoted Listing is clicked.

•       Revenue from Direct Checkout consists of fees an Etsy seller pays us to process credit, debit and Etsy Gift Card payments.  Direct Checkout fees vary between 3-4% of the item's total sale price plus a flat fee per order, depending on the country in which her bank account is located.  Direct Checkout fees are taken from the item's total sale price, including shipping.  Revenue from Direct Checkout is recognized when the corresponding transaction is made.

•       Revenue from Shipping Labels consists of fees an Etsy seller pays us when she purchases shipping labels through our platform, net of the cost we incur in purchasing those shipping labels.  … We recognize Shipping Label revenue when an Etsy seller purchases a shipping label.  We recognize Shipping Label revenue on a net basis as we are not the primary obligor in the delivery of these services.

•       Revenue from Wholesale consists of fees an Etsy seller pays us when she is approved to enroll in our Wholesale program.  The one-time Wholesale enrollment fee is recognized ratably over the estimated customer life.  Revenue from completed Wholesale transactions is included in Marketplace revenue.

*Other revenue*.  Other revenue includes the fees we receive from a third-party payment processor.  Other revenue is recognized as the transactions are processed by the third-party payment processor.

113.    The Prospectus also defined "operating expenses" as encompassing marketing, product development and general and administrative expenses.  It further defined "marking expenses" as follows:

Marketing expenses consist primarily of targeted online marketing costs, such as search engine marketing and, to a much lesser extent, offline marketing expenses, such as television advertising.  Marketing expenses also include employee-related costs, including stock-based compensation and expense, for our employees involved in marketing, public relations and communications activities.  Marketing expenses are primarily driven by investments to grown and retain members on our platform.

114.    The Prospectus also defined "cost of revenue" and stated that, among other things, it includes "costs of refunds made to Etsy buyers that we are not able to collect from Etsy sellers."

<u>**Materially False And Misleading Statements**</u>
<u>**In The Prospectus And Registration Statement**</u>

115.    The Class Period begins on April 16, 2015 with ETSY's filing of its Prospectus in connection with its IPO.  The Prospectus contained materially false and misleading statements, as follows.

***False and Misleading Discussions of Etsy's Business and Operations***

116.    The Prospectus falsely and misleadingly boasted that unique goods, either handmade items crafted by a seller herself or made with the help of small-batch manufacturers, were at the core of Etsy's marketplace, stating in relevant part:

> We operate a marketplace where people around the world connect, both online and offline, to make, sell and buy unique goods.  ***Handmade goods are the foundation of our marketplace***. ***Whether crafted by an Etsy seller herself, with the assistance of her team or with an outside manufacturer in small batches, handmade goods spring from the imagination and creativity of an Etsy seller and embody authorship, responsibility and transparency***.  We believe we are creating a new economy, which we call the Etsy Economy, where creative entrepreneurs find meaningful work and both global and local markets for their goods, and where thoughtful consumers discover and buy unique goods and build relationships with the people who sell them. …
>
> Our community is the heart and soul of Etsy.  ***Our community is made up of creative entrepreneurs who sell on our platform***, thoughtful consumers looking to buy unique goods in our marketplace, ***responsible manufacturers who help Etsy sellers grow their businesses*** and ***Etsy employees who maintain our platform and nurture our ecosystem***.

117.    Unbeknownst to investors but known by Defendants, this description was materially false and misleading because, *inter alia*, as stated by the CWs as described *supra* and as revealed by the Wedbush Securities investigation and contemporaneous analyst reports discussed *infra*: (a) Etsy's so-called community was also heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy; (b) Etsy had approved some of these counterfeiting and infringing manufacturers through its own "Handmade Inquiry" (or

HMI) investigations; (c) a large portion of Etsy's sellers utterly disregarded Etsy's policies for handmade goods, with Etsy's knowledge and tacit consent; (d) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing goods, and to remove such goods and their sellers, making it impossible for employees to adequately perform those duties; (e) Etsy forced rights holders to engage in onerous  processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (f) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's platform and nurturing its "ecosystem," were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (g) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale, were counterfeits or infringed on intellectual property rights; (h) all the foregoing violated Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy; and (i) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom.  It was also materially false and misleading for failure to comply with Item 303 of SEC Regulation S-K, 17 CFR 229.303, including without limitation subparts set forth in Item 303(a)(3)(ii) and (b)(2).

118.    The Prospectus also falsely and misleadingly touted the degree to which Etsy's "values" infused the company's operations and its marketplace:

*Our values are integral to everything we do*.

*We are a mindful, transparent and humane business*.  We believe that business interests and social and environmental responsibility are interwoven and aligned

and that the power of business should be used to strengthen communities and empower people.

*We plan and build for the long term.*  We want to build a company that lasts, and we plan to measure our success in years and decades.  ***Etsy sellers in particular depend on us and on our platform to grow their businesses, so we will strive to make decisions that are best for the long-term health of our ecosystem***.

*We value craftsmanship in all we make.*  Craftsmanship is the marriage of skill and passion.  We believe every job at our company should demonstrate our commitment to craft.  We are an engineering-driven company, and we think of our code as craft; we are makers of the products and services that our members use, and ***we approach the work we do with the same care and inspiration as do Etsy sellers***. …

*We keep it real, always.*  We have the courage and the will to do business in ways that are unconventional and impactful.  ***We strive to stay genuine, maintaining integrity, humility and sincerity in everything we do.  When we feel that we are not being true to our values or our mission, we are not afraid to stop and change course***.

119.   Unbeknownst to investors but known by Defendants, this description was materially false and misleading because, *inter alia*, as stated by the CWs as described *supra* and as revealed by the Wedbush Securities investigation and contemporaneous analyst reports discussed *infra*: (a) Etsy's conduct as described by the CWs herein was not "transparent," "genuine," done with "integrity" or "sincerity," or "best for the long-term health of [Etsy's] ecosystem" and, despite such conduct "not being true" to Etsy's values, it did not "stop and change course"; (b) a large portion of Etsy's sellers utterly disregarded Etsy's policies for handmade goods, with Etsy's knowledge and tacit consent; (c) Etsy's platform and so-called ecosystem was heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy; (d) Etsy had approved some of these counterfeiting and infringing manufacturers through its own "Handmade Inquiry" (or HMI) investigations; (e) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing

goods, and to remove such goods and their sellers, making it impossible for employees to adequately perform those duties; (f) Etsy forced rights holders to engage in onerous processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (g) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's platform and nurturing its ecosystem, were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (h) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale, were counterfeits or infringed on intellectual property rights; (g) all the foregoing violated Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy; and (i) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom. It was also materially false and misleading for failure to comply with Item 303 of SEC Regulation S-K, 17 CFR 229.303, including without limitation subparts set forth in Item 303(a)(3)(ii) and (b)(2).

120. The Prospectus also falsely and misleadingly touted the authenticity and trustworthiness of Etsy's marketplace as a key "strength" credited with helping Etsy achieve its scale, stating in relevant part:

> *Our Authentic, Trusted Marketplace.* **We have built an authentic, trusted marketplace that embodies our values-based culture**…. **We have developed a reputation for authenticity as a result of Etsy sellers' unique offerings and their adherence to our policies for handmade goods embodying the principles of authorship, responsibility and transparency**. … **The authenticity of our marketplace** and the connections among people in our community **are the cornerstones of our business**.

40

121.    Unbeknownst to investors but known by Defendants, this description was materially false and misleading because, *inter alia*, as stated by the CWs as described *supra* and as revealed by the Wedbush Securities investigation and contemporaneous analyst reports discussed *infra*: (a) Etsy's marketplace did not embody a "values-based culture" and was inauthentic in its failure to rein in large-scale counterfeiting and intellectual property infringement; (b) a large portion of Etsy's sellers utterly disregarded Etsy's policies for handmade goods, with Etsy's knowledge and tacit consent; (c) Etsy's marketplace was heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy; (d) Etsy had approved some of these counterfeiting and infringing manufacturers through its own "Handmade Inquiry" (or HMI) investigations; (e) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing goods, and to remove such goods and their sellers, making it impossible for employees to adequately perform those duties; (f) Etsy forced rights holders to engage in onerous  processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (g) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's platform and nurturing its "ecosystem," were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (h) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale, were counterfeits or infringed on intellectual property rights; (i) all the foregoing violated Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy;

41

and (j) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom.   It was also materially false and misleading for failure to comply with Item 303 of SEC Regulation S-K, 17 CFR 229.303, including without limitation subparts set forth in Item 303(a)(3)(ii) and (b)(2).

122.    The Prospectus also falsely and misleadingly described the makeup of Etsy's "community," stating in relevant part as follows.

(a)      It falsely and misleadingly described Etsy's sellers:

Our community includes Etsy sellers, Etsy buyers, responsible manufacturers and Etsy employees.

Etsy Sellers: Creative Entrepreneurs …

We support a diverse group of artists, makers, designers and collectors from around the world – from the solo artisan to the full-time jewelry maker with staff; from the antique furniture collector to the textile graphic designer partnering with a small-batch manufacturer.

Etsy sellers range from hobbyists to professional merchants, and have a broad range of personal and professional goals.  ...

The Prospectus went on to describe U.S. Etsy sellers as being 86% women and 95% running their Etsy shop from home.

(b)      The Prospectus also falsely and misleadingly described the "responsible manufacturers" with whom Etsy sellers worked to produce goods for sale on Etsy:

Responsible Manufacturers

We are committed to helping Etsy sellers who want to work with ***responsible, small-batch manufacturing partners*** to increase their production.  An Etsy seller might work with a cut-and-sew shop to make clothes she has designed, a casting house that casts her wax models for her jewelry designs or a digital printing house that prints her photographs on household items.  ***We ask Etsy sellers to work with manufacturers who adhere to our ethical expectations***: humane working conditions, non-discrimination policies, sustainability practices and no child, youth

or involuntary labor.  *As of December 31, 2014, we had approved more than 3,000 Etsy shops for over 5,000 manufacturing partnerships*.  …

     (c)      The Prospectus also falsely and misleadingly described the relationships between Etsy's employees and its sellers, stating in relevant part:

> Etsy Employees
>
> We too are members of our community.  Whether crafting our policies, talking with Etsy sellers and Etsy buyers in our online forums or building the tools and services underlying our marketplace, our employees create lasting, authentic connections in our community.  Etsy employees emphasize building personal relationships with Etsy sellers, visiting their shops, inviting them to our offices for lunch or celebrating with them at in-person events.

     123.     Unbeknownst to investors but known by Defendants, this description was materially false and misleading because, *inter alia*, as stated by the CWs as described *supra* and as revealed by the Wedbush Securities investigation and contemporaneous analyst reports discussed *infra*: (a) a large portion of Etsy's sellers utterly disregarded Etsy's policies for handmade goods, with Etsy's knowledge and tacit consent; (b) a large portion of Etsy's sellers utterly disregarded Etsy's policies for handmade goods, with Etsy's knowledge and tacit consent; (b) Etsy's marketplace was heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy – far cries from Etsy's portrayals of solo artisans working with small-batch manufacturers who lunch at Etsy's offices; (c) Etsy had approved some of these counterfeiting and infringing manufacturers through its own "Handmade Inquiry" (or HMI) investigations; (d) Etsy had approved some of these counterfeiting and infringing manufacturers through its own "Handmade Inquiry" (or HMI) investigations; (e) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing goods, and to remove such goods and their sellers, making it impossible for employees

to adequately perform those duties; (f) Etsy forced rights holders to engage in onerous processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (g) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's marketplace and community, were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (h) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale, were counterfeits or infringed on intellectual property rights; (i) all the foregoing violated Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy; and (j) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom. It was also materially false and misleading for failure to comply with Item 303 of SEC Regulation S-K, 17 CFR 229.303, including without limitation subparts set forth in Item 303(a)(3)(ii) and (b)(2).

124. The Prospectus also falsely and misleadingly described Etsy's policies and procedures to battle sellers of counterfeits and infringing products, stating in relevant part:

(a)     The Prospectus

Our members rely on us to maintain a marketplace that meets their expectations for authenticity. ***Our policies are designed to give the Etsy buyer the comfort that she is purchasing unique goods from a small business that adheres to certain principles***.

Most fundamentally, ***we require that goods listed in our marketplace be handmade, vintage or craft supplies***. …

***We enforce our policies*** through the following:

*Integrity team.*  The job of our Integrity team is to remove items that do not belong in our marketplace.  ***We use a combination of machine learning, automated systems and community-generated queries and flags to review items and shops that may be in violation of our policies***.

*Trust and Safety team*.  Our Trust and Safety team uses human review and sophisticated automated tools and algorithms to detect fraud.  ***We cancel transactions if fraud is detected, and we strive to prohibit bad actors from using our platform***.

(b)    The Prospectus also touted Etsy's procedures as sufficient to "promote confidence" in its marketplace:

Although we do not create or take possession of the items listed in our marketplace by Etsy sellers, ***we frequently receive communications alleging that items listed in our marketplace infringe third-party copyrights, trademarks, patents or other intellectual property rights*.  *We have intellectual property complaint and take-down procedures in place to address these communications, and <u>we believe such procedures are important to promote confidence in our marketplace</u>.  We follow these procedures to review complaints and relevant facts to determine whether to take <u>the appropriate action</u>, which may include removal of the item from our marketplace and, in certain cases, closing the shops of Etsy sellers who repeatedly violate our policies***.

125.    Unbeknownst to investors but known by Defendants, this description was materially false and misleading because, *inter alia*, as stated by the CWs as described *supra* and as revealed by the Wedbush Securities investigation and contemporaneous analyst reports discussed *infra*: (a) Etsy's policies were ineffective, gutted by loopholes, and unenforced, rendering them incapable of providing its buyers with comfort that purchases were "from a small business that adheres to certain principles" and incapable of promoting true confidence in its marketplace; (b) Etsy did not require that goods listed in its marketplace be handmade, vintage or craft supplies, so as a result, a large portion of Etsy's sellers utterly disregarded Etsy's policies for handmade goods, with Etsy's knowledge and tacit consent; (c) Etsy not only failed to enforce its policies, its employees were affirmatively instructed to refrain from enforcement against certain high-volume sellers; (d) Etsy did not strive to prohibit bad actors from using its platform; (e) Etsy

45

either failed to follow its "intellectual property complaint and takedown" procedures or, having done so, failed to take appropriate action thereafter; (f) Etsy's marketplace was heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy; (g) Etsy had approved some of these counterfeiting and infringing manufacturers through its own "Handmade Inquiry" (or HMI) investigations; (h) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing goods, and to remove such goods and their sellers, making it impossible for employees to adequately perform those duties; (i) Etsy forced rights holders to engage in onerous  processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (j) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's platform and nurturing its "ecosystem," were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (k) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale, were counterfeits or infringed on intellectual property rights; (l) all the foregoing violated Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy; and (m) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom.   It was also materially false and misleading for failure to comply with Item 303 of SEC Regulation S-K, 17 CFR 229.303, including without limitation subparts set forth in Item 303(a)(3)(ii) and (b)(2).

126.    In a letter from Defendant Dickerson (the so-called "Letter from Chad"), the Prospectus further falsely and misleadingly touted the strength and integrity of the Etsy "community," stating  in relevant part:

> At Etsy, *we believe that our strength and business success rest in the interdependence among Etsy sellers*, Etsy buyers, *responsible manufacturers and our employees* – in other words, our community.
>
> Etsy sellers represent a diverse mosaic of needs and aspirations.  Some sellers are first-time small business owners and benefit greatly from our seller support and education programs.  *The vast majority of sellers on Etsy are one-person shops*, and we continue to embrace and develop new ways to support them.  Other sellers have grown and need help scaling with the assistance of responsible manufacturers, creating opportunity for other participants in the Etsy Economy.  In all cases, we empower each Etsy seller to succeed on her own terms.
>
> *I have heard concerns that by allowing our sellers to partner with responsible manufacturers, we are diluting our handmade ethos.*  I share our community's desire to preserve what is special about Etsy.  *After all, Etsy has always served as an antidote to mass manufacturing.  We still do*.  *With our vision of responsible manufacturing*, we are promoting a new, people-centered model in which *artisans can preserve the spirit of craftsmanship and grow responsibly by collaborating with people at small-batch manufacturers* to make their goods. …

127.    Unbeknownst to investors but known by Defendants, this description was materially false and misleading because, *inter alia*, as stated by the CWs as described *supra* and as revealed by the Wedbush Securities investigation and contemporaneous analyst reports discussed *infra*: (a) Etsy and Defendant Dickerson did not, and could not, believe that Etsy's "strength and business success" rested in interdependence among Etsy sellers, "responsible" manufacturers, and Etsy employees; (b) Etsy did not serve as an "antidote to mass manufacturing" and was not promoting a model of "responsible manufacturing" between "artisans" and "small-batch manufacturers," given that its platform and community were heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy; (c) Etsy had approved some

of these counterfeiting and infringing manufacturers through its own "Handmade Inquiry" (or HMI) investigations; (d) a large portion of Etsy's sellers utterly disregarded Etsy's policies for handmade goods, with Etsy's knowledge and tacit consent; (e) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing goods, and to remove such goods and their sellers, making it impossible for employees to adequately perform those duties; (f) Etsy forced rights holders to engage in onerous  processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (g) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's platform and nurturing its ecosystem, were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (h) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale, were counterfeits or infringed on intellectual property rights; (i) all the foregoing violated Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy; and (j) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom.   It was also materially false and misleading for failure to comply with Item 303 of SEC Regulation S-K, 17 CFR 229.303, including without limitation subparts set forth in Item 303(a)(3)(ii) and (b)(2).

128.    Later in Defendant Dickerson's letter, the Prospectus offered reasons "why Etsy should be a public company," including:

> Accountability / transparency.  ***Etsy has a long history of providing data to the community, everything from key financial metrics***, to our gross happiness index,

to our carbon footprint data, to our workplace diversity stats. ***As a public company, we will be able to provide a higher level of transparency and accountability to a broader number of people***.

129.     Unbeknownst to investors but known by Defendants, this description was materially false and misleading because, *inter alia*, as stated by the CWs as described *supra* and as revealed by the Wedbush Securities investigation and contemporaneous analyst reports discussed *infra*: (a) Etsy was not providing "transparency" and "accountability" to investors given the misstatements and omissions at issue, as described herein; (b) Etsy's platform and community was heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy; (c) Etsy had approved some of these counterfeiting and infringing manufacturers through its own "Handmade Inquiry" (or HMI) investigations; (d) a large portion of Etsy's sellers utterly disregarded Etsy's policies for handmade goods, with Etsy's knowledge and tacit consent; (e) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing goods, and to remove such goods and their sellers, making it impossible for employees to adequately perform those duties; (f) Etsy forced rights holders to engage in onerous  processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (g) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's platform and nurturing its ecosystem, were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (h) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale, were counterfeits or infringed on

49

intellectual property rights; (i) all the foregoing violated Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy; and (j) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom.  It was also materially false and misleading for failure to comply with Item 303 of SEC Regulation S-K, 17 CFR 229.303, including without limitation subparts set forth in Item 303(a)(3)(ii) and (b)(2).

### *False and Misleading Performance Metrics And Operating And Financial Results*

130.   The Prospectus falsely and misleadingly reported a litany of Etsy performance metrics and operating and financial results, including:

(a)   Etsy had 54.0 million members as of December 31, 2014;

(b)   Etsy had 1.4 million active sellers as of December 31, 2014, up 26.0% from 1.1 million as of December 31, 2014;

(c)   Etsy sellers generated GMS of $1.93 billion in 2014, up 43.3% over 2013 GMS of $1.35 billion;

(d)   Etsy generated total revenue of $195.6 million in 2014, up 56.4% over 2013 revenues of $125.0 million where "[o]ur revenue is record net of actual and expected refunds";

(e)   Etsy's total 2014 revenues included $108.7 million in Marketplace revenues, up 38.4% from $78.5 million in 2013, which Etsy attributed as "primarily a result of an increase in the amount of transaction fees received and an increase in listings from new and existing Etsy sellers with a corresponding increase in listing fees received";

(f)   Etsy's total 2014 revenues included $82.5 million in Seller Services revenues, up 92.7% from $42.8 million in 2013, which Etsy attributed as "primarily driven by an increase in

revenue from Direct Checkout services, as well as increases in Promoted Listings and Shipping Labels;

(g)     Etsy's cost of revenue in 2014 was $73.6 million, up 54.1% from $47.7 million in 2013;

(h)     Etsy generated a net loss of $15.2 million from a gross profit of $121.9 million in 2014;

(i)     Etsy generated adjusted EBITDA of $23.1 million, compared to $16.9 million in 2013, in 2014;

(j)     Etsy incurred $39.7 million in marketing expenses in 2014, up 122.2% from $17.8 million in 2013, which Etsy attributed as "primarily as a result of an increase in search engine marketing from Google product listing ads and, to a lesser extent, from an increase in employee-related costs resulting from increased headcount in our marketing team, which include our public relations and communications teams."

131.     Unbeknownst to investors but known by Defendants, these performance metrics and operating and financial results were materially false and misleading because, *inter alia*, as stated by the CWs as described *supra* and as revealed by the Wedbush Securities investigation and contemporaneous analyst reports as discussed *infra*: (a) Etsy's platform and community was heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy; (b) a large portion of Etsy's sellers utterly disregarded Etsy's policies, including those regarding handmade goods and intellectual property, with Etsy's knowledge and tacit consent; (b) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing goods, and to remove such goods and their sellers,

making it impossible for employees to adequately perform those duties; (c) Etsy forced rights holders to engage in onerous  processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (d) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's platform and nurturing its ecosystem, were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (e) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale, were counterfeits or infringed on intellectual property rights; (f) all the foregoing violated Etsy's Terms of Use, Guidelines, and policies, including its Copyright and Intellectual Property Policy; and (g) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom; (h) Etsy's actual number of members and active sellers, less the counterfeiters and sellers infringing on intellectual property rights was substantially less than reported; (i) Etsy's GMS, total revenues, Marketplace revenues, Seller Services revenues, and EBITDA, less fees and revenues derived from the listing, advertising, selling, and shipping of counterfeit and infringing items, were all substantially less than reported, while net loss was substantially greater than reported; (j) Etsy's cost of revenue and marketing expense would have been substantially greater than reported had it removed the counterfeiters and sellers infringing on intellectual property rights, their shops, and their items listed for sale from its marketplace.  It was also materially false and misleading for failure to comply with Item 303 of SEC Regulation S-K, 17 CFR 229.303, including without limitation subparts set forth in Item 303(a)(3)(ii) and (b)(2).

**The Truth Begins To Emerge In Partial Corrective Events**

132.    On May 11, 2015, before the market opened, numerous news outlets, including *Bloomberg* and the *Associated Press*, reported that an equity analyst at Wedbush Securities issued a note downgrading Etsy to "Underperform" (the "5/11/2015 Wedbush Note").  The 5/11/2015 Wedbush Note stated, in relevant parts as follows:

(a)    "[O]ur analysis and discussions with IP [intellectual property] lawyers lead us to believe questionable seller practices may draw increased scrutiny, eventually limiting volume growth."

(b)    "Our research indicates as many as 2 million items on Etsy (>5% of all merchandise) may potentially be either counterfeit or constitute trademark or copyright infringement (page 6.  We believe the share of GMS may be greater considering Etsy has become a go-to destination for counterfeits (popular reference on page 5)."

(c)    "Counterfeit candidates include items infringing on Louis Vuitton, Chanel and Michael Kors, as well as a wide range of Disney and NFL brands (pages 7-17)."  Those pages, in Figures 8-18, provided sample listings of likely counterfeit candidates, including one (Figure 12) that actually listed a mold to permit the buyer to make his or her own counterfeits, and likely copyright infringement candidates.

(d)    "Sample of high risk listings indicates some violations may be 20x more likely on Etsy than eBay and even more likely than Alibaba's Aliexpress (page 4)."

(e)    "Brands increasingly pursuing sellers on Etsy could materially reduce listing fees and commissions.  We believe a reduction in listing fees may be meaningful as they constitute as much as 20% of revenue (page 4).  Given the aforementioned brands' track record of pursuing trademark violated, our checks indicate they are likely to pursue Etsy sellers more vigorously in the future as it becomes bigger, more visible and cash-rich post IPO."

(f)     "If Etsy chooses to continue to ignore these potential violations, we believe it could

tarnish its brand with both buyers and sellers."

(g)     On page 4, the 5/11/2015 Wedbush Note stated:

Our research indicates as many as 2 million items on Etsy (>5% of all merchandise)
may be either counterfeit or constitute trademark or copyright infringement (page
7). These items are either using a trademarked text/image in the item itself and/or
in its description. We have reviewed hundreds of these items and did not find
indications that any of these sellers are official licensed retailers of those brands.
We have also ordered a few of the items and did not see any visible evidence of a
trademark as one would find on an officially licensed product (e.g. the hologram
sticker on NBA gear or tag on Disney items). We believe this puts these items at
high risk of being counterfeit or a trademark/copyright infringement. …

We have asked attorneys specializing in copyright law to view some of these items
and they confirmed our suspicions that the items presented in Figures 8-18 are
likely infringing on trademarks….

(h)     Page 4 of the 5/11/2015 Wedbush Note, in Figure 4, compared the relative counts

of various potential counterfeit Disney items on Etsy against eBay and AliExpress, demonstrating

a significantly higher percentage of such items on Etsy (as compared to total listings) than the

other sites. An extremely detailed listing of such items, listing all the brands with high levels of

likely counterfeit and/or trademark infringing items listed for sale, is found on pages 18-24 of the

note in Figures 19-25.

(i)     Page 4 of the 5/11/2015 Wedbush Note, in Figure 5, demonstrated the importance

of listing fees for Etsy, inasmuch as they make up 21% of total 2014 revenues.

(j)     Page 6 of the 5/11/2015 Wedbush Note, in Figure 7, listed a multitude of brands

(Disney, NFL, DC Comics, Marvel, NCAA, Star Wars, etc.) and the high number of listings for

each in searches for handmade items, *i.e.*, items with potential trademark or copyright violations.

Altogether, these brands accounted for over 2 million listings among handmade items or 6.3% of

*all* items (handmade, vintage, manufactured) listed for sale overall on Etsy (they accounted for 8.6% of total handmade items).

133. As a result of this news, which served to partially correct Defendants' fraud as outlined above, shares of Etsy fell $1.86 (or 8.2%), on unusually heavy volume, to close at $20.85 on May 11, 2015.

134. On May 19, 2015, after hours, Etsy released its Q1 2015 earnings in a Form 8-K signed by Defendant Salen and filed with the SEC along with an attached press release (together the "5/19/2015 Earnings Release"). It was dissected in analyst reports that were issued on May 20, 2015 following analyst ratings adjustments made earlier in the day.  Among other things:

(a) Etsy announced GMS of $531.9 million, with a stagnant active seller base of 1.4 million members, in the 5/19/2015 Earnings Release.  Analysts were quick to point to this metric as a source for concern.  For instance, a Wedbush note issued May 20, 2015 (the "5/20/2015 Wedbush Note"), stating, "We believe deceleration of GMS volume to 28% from 29% in 4Q14 may indicate marketplace reaching maturity earlier than expected."  Similarly, a Morgan Stanley note issued May 20, 2015 (the "5/20/2015 Morgan Stanley Note") stated, "the 1100bp [basis point] GMS growth deceleration (39% YoY [year over year] growth in 4Q vs 28% YoY growth in 1Q) is likely to raise near-term questions about the pace of Etsy's ability to grow in its addressable market."  These reports reflect, among other things, the concern that Etsy would have difficulty growing revenues through growth in legitimate sales on its website.

(b) In the 5/19/2015 Earnings Release, Etsy announced revenue of $58.5 million (down from $64.9 million in Q4 2014), including $30.2 million in Marketplace revenues and $27.3 million in Seller Services revenues.  The 5/20/2015 Wedbush Note analyzed this result as follows, "We expect Etsy to enjoy rapid near-term growth within its niche as it increases marketing spend.

55

However, we believe the dilution of the brand by potentially counterfeit and mass manufactured items will curtail listing and revenue growth." Once again, analysts focused on the impact of runaway counterfeit and infringing products on Etsy's performance.

(c)      In the 5/19/2015 Earnings Release, Etsy announced Adjusted EBITDA of $6.7 million (as compared to $9.3 million in Q4 2015), representing a meager 9.3% year-over-year increase and falling short of analyst expectations. It simultaneously reported alarming increases in cost of revenues (at $20.7 million, a 34.4% year-over-year increase from the $15.4 million reported in Q1 2014) and in marketing expenses (at $12.2 million, a 62.6% year-over-year increase from the $7.5 million reported in Q1 2014). The 5/20/2015 Wedbush Note was highly critical, stating, "Missed estimates first quarter out of the gate on increased marketing spend. Adjusted EBITDA of $6.7 million missed consensus $7.2 million on in-line revenue. Marketing spend grew 39% which dragged Adj. EBITDA margin to 11.4% from 15.1% in 1Q14." It added, "Reducing 2015 Adj. EBITDA estimate to $31.6 million from $32.9 million to reflect increased marketing spend." It also noted the perils of Etsy's reliance upon increased marketing spend to prop up results, given its unaddressed problems with counterfeit and infringing products, by highlighting as one of its "Risks" that "We believe strong short term results driven by marketing spend could lead to lower margins and increased penetration of mass manufactured and branded items could diminish Etsy's brand."

(d)      In reiterating an Underperform rating and lowering its 12-month price target, the 5/20/2015 Wedbush Note negatively assessed Etsy's prospects in light of its failure to address counterfeit and intellectual property infringing items, stating, *inter alia*:

> We believe the deceleration in growth may get exacerbated down the line as the company grapples with the impact of mass manufactured (see initiation) and potential counterfeit items on its marketplace (see downgrade note). … [W]e are comfortable with the opinions of the three intellectual property lawyers we spoke

with regarding this topic.  We posit that even a common sense test of the items on the following pages can help separate potential violations from fan art.  We would also note that the blog post quoted by management during the call indicated not seller frustration with anti-fraud measures, but rather, concerns around insufficient implementation of those measures (page 2).

The 5/20/2015 Wedbush Note included, on pages 3-6, in Figures 3-9, examples of likely counterfeit listings, actual counterfeit products, and even Etsy marketing emails promoting counterfeit and infringing products to members.

135.    On this news, which served to partially correct Defendants' fraud as outlined above, Etsy's stock price cratered, falling $3.80 (or 18.1%) on exceptionally high volume from its May 19, 2015 closing price of $21.00 to close at $17.20 on May 20, 2015.

**Defendants Make Additional False And Misleading Statements**

136.    Amidst this massive decline, Defendants attempted to buoy Etsy's stock price by making additional materially false and misleading statements, which served to dull the impacts of the 5/11/2015 Wedbush Note, the 5/19/2015 Earnings Release, the 5/20/2015 Wedbush Note, and the 5/20/2015 Morgan Stanley Note and to perpetuate inflation in Etsy's stock price.

137.    Specifically, on May 20, 2015, Defendants Etsy, Dickerson, and Salen discussed the 5/19/2015 Earnings Release in a conference call with analysts (the "5/20/2015 Earnings Call"). On it, an analyst asked, "I get a lot of questions around fraudulent and/or counterfeit goods.  Could you talk to the way Etsy works to police that and how you think about that, the presence of non-licensed products on the site?"  In response, Defendant Dickerson made the following materially false and misleading misstatements:

(a)    In opening remarks in response to the analyst's questions he stated, in relevant part:

[B]ased on the work that we've done for the transparency report we're able to give you today some insights into our great effort and our success in combatting IT infringement.  So I want to stress three points.  First, ***we earn respect by following industry leading best practices and establish*** [sic] ***law***.  ...  And third ***we strive for a balanced approach that takes into account the interest of our sellers and IP***

*owners and we believe that's working.  We at Etsy partner with major brands to address the problem of infringing articles*.  And in fact we *are also accused of being too aggressive in taking down material posted by sellers*.

So it's important to note that I am not using the word counterfeit, people can't even agree on the definition of that term.  So, to avoid confusion, I will address the broader issue of items that appear on the Etsy website that appear to misuse intellectual property.  So now I will dive deeper into those three points.

(b)      In elaborating on his first point of emphasis, he stated:

The first point about, earning respect by following industry-leading best practices and establish [sic] law.  It's certainly true that brand owner[s] complain to us about infringing items appearing on Etsy, but our experience has been that when we engage in a cooperative and transparent way with brand owners we enjoy a productive and beneficial relationship and partnership with those brands.  *Etsy has a dedicated legal support team that responds to proper takedown notices by properly removing content* and providing the Etsy seller an explanation of what happened and the contact information of the notifying party.

*We also terminate accounts of repeat offenders and we use technology to prevent bad actors from returning to our marketplace*.

*All our practices are based on the Digital Millennium Copyright Act, the Communications Decency Act, the Lanham Act which governs trademark, the Copyright Act, industry best practices and established case law*.

(c)      In elaborating on this third point of emphasis, he stated, in relevant part:

So the third point, that *we strive for a balanced approach that takes into account the interest of our sellers and the IP owners* and that *we believe it's working*.  *[W]e partnered with major brands to address the problem of infringing articles*.  And in fact as I said earlier, *we're often accused of being too aggressive and taking down material posted by sellers*.  So *Etsy works with brands to influence the technology that we use to proactively locate, take action and prevent bad actors from returning and we continually update that technology because bad actors are always updating their tactics*.  For security reasons we can't provide detail on to their systems.

At the same time, *many sellers complain that we go too far in taking down infringing items and closing shops based on our policies*.

(d)      In summary, Defendant Dickerson stated, "So *we believe* in conclusion *that the facts and the data give us reason to be proud of the work we do to combat infringing materials*."

58

138.    Unbeknownst to investors, the foregoing statements were materially false and misleading when made because (a) Etsy did not follow "industry leading" or "industry best" practices as regards counterfeits and items infringing on intellectual property; (b) Etsy and Defendant Dickerson did not, and could not, believe that Etsy's approach to counterfeits and items infringing intellectual property was working; (c) Etsy ignored the intellectual property rights of scores of major brands; (d) Etsy was being too lax, not too aggressive, in taking down counterfeit and infringing items and shops; (e) Etsy's "dedicated legal support team" responded to complaints by intellectual property holders first with prepopulated messages and then by doing the bare minimum to address the concern, such as removing only the precise infringing item identified by item number while leaving the infringing seller's other improper items and shop intact; (f) Etsy's platform and community were heavily made up of large-scale counterfeiters and sellers infringing on intellectual property rights, both of which relied on Chinese factories to mass-produce improper goods for listing and sale on Etsy; (g) Etsy failed to properly staff any efforts to maintain the integrity of its marketplace, to identify counterfeit and intellectual property infringing goods, and to remove such goods and their sellers, making it impossible for employees to adequately perform those duties; (h) Etsy forced rights holders to engage in onerous  processes to protect their intellectual property and, even then, responded to the bare minimum extent possible; (i) Etsy's marketplace integrity employees were disincentivized from properly maintaining Etsy's platform and nurturing its ecosystem, were instructed to permit high-volume counterfeiters and intellectual property infringing sellers to stay in operation on Etsy to ensure continued fees from such sellers and to maintain appearances, were told to conceal weekly fraud reports from coworkers, and found that their complaints to superiors either went ignored or prompted retaliation; (j) as a result of the foregoing, millions of listed items on Etsy's website, over 5% of all merchandise listed for sale,

were counterfeits or infringed on intellectual property rights; and (k) Etsy's reported operating performance and financial results were therefore heavily affected by and dependent upon this massive stream of improper and illegal goods and the assortment of fees and revenues derived therefrom.

139.     In addition to the foregoing materially false and misleading statements, Defendant Dickerson made an important admission, when he repeatedly stated (as his second point of emphasis) that "someone on the outside looking at our site lacks the context and the background information to determine what is infringing and what's not."  In Dickerson's own words, Etsy's investors would, on their own, be unable to determine the scope and extent of the infringing products problem on Etsy's website.  By his admission, they were beholden to and reliant upon the Defendants' statements during the Class Period about that topic.

### The Truth Continues To Emerge In Additional Partial Corrective Events

140.     On August 4, 2015, after hours, Etsy released its Q2 2015 earnings in a Form 8-K signed by Defendant Salen and filed with the SEC along with an attached press release (together the "8/4/2015 Earnings Release").  Etsy's anticipated and actual performance was dissected in analyst reports that were issued on August 4-5, 2015.  Among other things:

(a)     Etsy announced Q2 2015 GMS of $546.2 million, with a nearly stagnant active seller base of "nearly 1.5 million" members, in the 8/4/2015 Earnings Release.  Analysts were quick to point to this metric as a source for concern.  For instance, a Wedbush analyst note issued August 4, 2015 (the "8/4/2015 Wedbush Note") noted, "Several key metrics continued to decelerate.  The sharp increase in marketing was only enough to generate 24.6% GMS growth, down from 28.2% in Q1 and 39.1% in Q4.  Active sellers decelerated to 24.6% form 25.8% and active buyers from 31.6% from 36.5%, both sequentially."  Likewise, a Morgan Stanley note issued August 4, 2015 (the "8/4/2015 Morgan Stanley Note"), stating, "We maintain our Equal-

weight as margin contraction and slowing GMS growth appear on the horizon heading into 2Q results" and "Lowing Forward GMS Estimates: We are reducing our forward near-term GMS estimates given more difficult year-on-year compares in 2Q:15 and 3Q:15 and (longer-term) more tepid assumptions in GMS per buyer."  These metrics once again demonstrated the concern, now extending through Etsy's first two operating quarters as a public company, that it would have difficulty growing revenues through growth in legitimate sales on its website.  An August 5, 2015 Morgan Stanley note (the "8/5/2015 Morgan Stanley Note") noted that "GMS Y/Y growth still slowed by 366bp to 25% in 2Q from 28% in 1Q" and lowered its GMS estimated by ~2%.

(b)    In the 8/4/2015 Earnings Release, Etsy announced revenue of $61.4 million, including $30.5 million in Marketplace revenues and $29.8 million in Seller Services revenues. The 8/4/2015 Wedbush Note stated, "[R]evenue growth was driven by marketing spend.  Revenue growth of 44% was same as Q1, but required a 77% YoY increase in marketing spend" and "We expect Etsy to enjoy near-term growth within its niche as it increasing marketing spend.  However, we believe dilution of the brand by potentially counterfeit and mass manufactured items may curtail listing and revenue growth, especially as seller shift their items to *Handmade at Amazon*."

(c)    The 8/4/2015 Earnings Release reported Adjusted EBITDA of $4.1 million (a 38% decline from Q1 2015).  It also continued the trend of alarming disclosures as to rising cost of revenues (at $21.9 million, a 26.6% year-over-year increase from the $17.3 million reported in Q2 2014) and in marketing expenses (at $15.5 million, a 76.1% year-over-year increase from the $8.8 million reported in Q2 2014).  Analysts sounded the alarm.  The 8/4/2015 Morgan Stanley note stated, "Rising Customer Acquisition Costs Mean Higher Marketing Spend: We are also taking a more conservative view on forward margins, and raising our expected near-term marketing spend. …. [W]e expect now marketing spend to rise both year over year and sequentially in Q2 as the

company continues to ramp e-mail and affiliate marketing efforts."  It added, "[A] large part of Etsy's success will be predicated on its ability to manage buyer acquisition costs…which in the near-term we now see being more elevated.  In all, we are raising our 2015 marketing estimate by 12% ($7mm) and are now assuming marketing spend per buyer grows at over 30% for the remainder of 2015, ~1,000bp higher than 1Q:15."  It also lowered 2016 EBITDA estimates by 22%, or $9 million.  The 8/4/2015 Wedbush Note also reduced its 2015 EBITDA estimate "to reflect higher marketing spend," which it noted had increased 77% year-over-year.  The 8/5/2015 Morgan Stanley Note added:

> Active buyers came in 1% lower than expected, as Etsy added 860,000 buyers sequentially…the lowest sequential growth we have seen in 10 quarters of history. This buyer deceleration is particularly notable for a company of Etsy's size, and occurred even as the company increased its ad spending (more on this below). … [W]e are lowering our 2015 active buyer estimates….

> …And The Cost of Each Buyer is Accelerating:  Customer acquisition costs are rising too, as Etsy's marketing spend per buyer rose by 34% Y/Y (vs. us at 30%). In addition, the company said they plan to spend more on marketing in absolute dollars in 3A compared with both 2Q:15 and 3Q:14.  2Q results and this forward commentary speak to how Etsy is having to spend more to grow…which causes us to raise our 2015 and 2016 marketing spend by 15% ($9mm) and 14% ($11mm), respectively.

(d)      The 8/4/2015 Wedbush Note reiterated its Underperform rating and lowered its 12-month price target to $9.  It also raised more concerns about the impact of Etsy's failure to address its problems with counterfeit and infringing goods, stating in relevant part:

> We believe many sellers angered by the increasing presence of mass manufactured and counterfeit goods on Etsy are likely to shift items to Handmade at Amazon…. We believe that although seller frustration has been rising, their alternatives have previously been limited to creating a storefront through platforms such as Shopify. We see Amazon's value proposition to sellers as clearly superior, with competitive take rates, access to Amazon Prime, and most importantly – a commitment to purely handmade items.

The 8/5/2015 Morgan Stanley Note also lowered its 12-month price target.

141.    On this news, which served to partially correct Defendants' fraud as outlined above, Etsy's stock price cratered once again, falling $1.27 (or 6.2%) on high volume from its August 3, 2015 closing price of $20.50 to close at $19.23 on August 4, 2015, and falling another $5.45 (or 40%) on high volume from its August 4, 2015 closing price to close at $13.78 on August 5, 2015.

142.    As a direct and proximate result of Defendants' wrongful acts, misstatements, and omissions, and the precipitous declines in the market value of Etsy's securities upon revelations of their fraud, all as alleged herein, Plaintiffs and other Class members have suffered significant losses and damages.

## CLASS ACTION ALLEGATIONS

143.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Etsy securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of Etsy, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

144.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Etsy securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Etsy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

145.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

146.    Lead Plaintiff and the other Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

147.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period, including those made in the Prospectus and Registration Statement, misrepresented material facts about the business, operations and management of Etsy;

- whether the Individual Defendants caused Etsy to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements;

- whether the prices of Etsy securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

148.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FRAUD ON THE MARKET PRESUMPTION

149.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Etsy securities are traded in an efficient market;

- Etsy's shares were liquid and traded with moderate to heavy volume during the Class Period;

- Etsy's shares traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Etsy's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Etsy securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

150.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

151.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

152.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this

Complaint.   The specific statements pleaded herein were not properly identified as forward-looking statements when made.

153.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

154.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, the speaker knew the statement was false or misleading.

## DEFENDANTS' SCIENTER

155.     To the extent it is required to be plead for certain of the claims alleged herein, Defendants' scienter is readily apparent.

156.     It is clear that, at all relevant times, Defendants acted knowingly and intentionally. Given the sheer scope of the problem of counterfeit and intellectual property infringing items on Etsy, which was later revealed to involve over 2 million listed items accounting for more than 5% of all merchandise listed on Etsy, and the potentially massive impact on Etsy's reported performance metrics and financial results, it defies credulity that Defendants did not know the effectiveness or lack thereof of the company's efforts to address the issue.  Moreover, as alleged in greater detail *supra*:

(a)     CW1 established that Defendants Dickerson and Salen knew of Integrity Team presentations and monthly "Lunch and Learn" events at which Etsy's policy of permitting counterfeit items to remain listed if designated as "handmade" or "vintage" was discussed.

(b)      CW6 stated that Defendants Dickerson and Salen attended a companywide meeting in 2013 held to discuss the potential impacts of expanding allowance of manufactured goods on Etsy's website would have on Etsy's counterfeit and trademark infringement problems.

(c)      CW4, who reported directed to Defendant Dickerson, said that he was aware of the counterfeit and trademark infringement problems at Etsy.

(d)      CW1 had direct access to Heather Jassey, Etsy's head of Member Services described as Defendant Dickerson's "right-hand woman," and confirmed that Ms. Jassey knew the extent of counterfeit items and trademark violations on Etsy.

(e)      Multiple CWs (CW1 and CW2) reported that Etsy's Integrity Team wrote weekly "fraud reports" about the team's activities, including data on account closures, details of specific fraud cases, and tips for identifying fraud on Etsy's website and confirmed that these reports were sent at least as high as Ms. Jassey.

(f)      According to CW1, Etsy maintained a full repository of all its fraud investigations, in the form of a server in New Jersey containing digital records of all files for the Integrity Team investigations.

(g)      Multiple CWs escalated complaints within Etsy, with results that could only have been approved at the highest levels of management – a facial policy change (which was ignored after implementation) in the case of CW1's complaints to Etsy's Director of Trust and Safety, but a retaliatory termination in the case of CW2.

(h)      Moreover, Etsy corporate directives, which could only have emanated from the highest ranks of the company demonstrate knowing misconduct.  For instance, CW1 recounted that: (i) Integrity Team members, including CW1, were instructed not to share the team's "fraud reports" with rank-and-file employees; (ii) Integrity Team members were instructed to not shut

down the shops of counterfeiters and intellectual property infringers who generated high fee revenues for Etsy and/or whose shop closures might cause Etsy's marketplace to appear unstable; and (iii) that Etsy instituted a job performance quota system that penalized employees for devoting time to researching and removing all counterfeit and infringing items and accounts of bad actors.

(i)      CW2 recounted that Etsy considered implementing a vetting process for sellers that would review products for potential counterfeit or intellectual property concerns before permitting them to be listed for sale, with discussions occurring at meetings attended by senior executives. CW2 said that CW2 was "pretty sure" that Defendants Dickerson and Salen knew of and were part of those discussions.  According to CW2, after a months-long process involving Etsy software engineers, policy and legal personnel, the conclusion was that such a vetting process would require a lot of changes to the Etsy platform itself, so the idea was abandoned.

157.    At minimum, based on the foregoing facts and the rest of the CW allegations set forth above, Defendants' recklessness is clear.  Defendants knew or should have known that their Class Period misstatements and omissions, as set forth herein, were false and misleading when made.  They had a duty to monitor the information indicating that these statements were false, such that their failure to do so could only have been through their recklessness.  Moreover, this information is imputable to the Individual Defendants, due to their titles, roles, and responsibilities, including their duties to oversee Etsy's operations, whether they actually knew it or not.

158.    Defendants also had the motive and opportunity to lie.  Defendants' opportunity is indisputable, as they possessed unique access to and control over adverse facts not publicly known to investors that rendered their public statements false and misleading.

159.    As for motive, as discussed in greater detail *supra*, Defendants reaped huge proceeds from the IPO.  Etsy pocketed $194.2 million in net proceeds, which it intended to use for

important corporate purposes like the build-out of its headquarters and potential acquisitions. Various selling stockholders received an aggregate of $87.3 million in net proceeds, of which $39.9 million and $22.5 million, respectively, went to private equity firms in which Defendants Breyer and Wilson are partners and from which they both therefore were paid their partnership share. The Underwriter Defendants (defined *infra*) were compensated an aggregate of $19.9 million dollars in conjunction with their work on the IPO. Also, as discussed *supra*, Defendants Breyer and Wilson, and their affiliated entities, benefitted by having millions of preferred shares converted into common stock, while Defendants Dickerson, Burns, Klein, and Salen benefitted by the creation of a public float of common stock, which made it more likely that they could exercise their options at a profit.

160.   Defendants were also under a clear duty to speak truthfully and, having chosen to speak, were obligated to speak the whole truth. As discussed *supra*, Defendants made and/or caused to be made the alleged false and misleading statements and omissions alleged herein, and in the case of the Individual Defendants, signed the SEC filings within which such misstatements and omissions appeared. As discussed herein, Defendants violated such duties.

161.   As established by the foregoing, Defendants, by virtue not only of their positions at Etsy, including their responsibilities at Etsy, as described in their corporate biographies and Etsy's SEC filings, but also their actual receipt of information reflecting the true facts regarding Etsy, their control over and/or receipt of its materially misleading misstatements and omissions as alleged above, and their having signed or been quoted in the SEC filings and other documents or statements containing the misstatements and omissions at issue, as discussed herein, all of which made them privy to confidential proprietary information concerning Etsy, participated in the fraudulent scheme alleged herein. In addition, Defendants' knowledge included awareness of the

existence of pervasive regulatory compliance issues and material internal weaknesses which had previously resulted in materially inaccurate reported financial results.

162.    Moreover, the fraud alleged herein implicates the core operations of Etsy.  The impact of large-scale counterfeiting and infringing items illegally listed for sale on Etsy's website, both in terms of the seller-based fees that form Etsy's revenue stream and in terms of the reputational and marketplace integrity issues implicated by such misconduct, are at the heart of Etsy's business and operations.  In light of these facts, it is inconceivable that Defendant Etsy and the Individual Defendants, its executive management and its Board, did not know the facts and circumstances of the fraud as alleged herein.  Moreover, such knowledge is imputable to the Defendants, given the implication of core operations, the Individual Defendants' roles and status within Etsy, and the facts regarding the funneling of information to them as alleged herein

## THE CLAIMS ARE TIMELY

163.    The claims set forth herein are timely filed.

## LOSS CAUSATION/ECONOMIC LOSS

164.    The market for Etsy shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Etsy shares and operated as a fraud or deceit on Class Period purchasers of Etsy shares by misrepresenting the material facts detailed herein.  As detailed above, when Defendants' prior misrepresentations became known to the public, the price of Etsy shares fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of Etsy shares during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

165.    During the Class Period, Defendants presented a misleading picture of Etsy's financial condition, revenues, growth, performance, and business prospects.  Defendants' false and

misleading statements had the intended effect, permitting Defendants to raise substantial amounts of funds through Etsy's IPO and thereafter causing Etsy's shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

166.    In response to the issuance of analyst reports and earnings releases during the Class Period, as described above, the price of Etsy shares sharply dropped on high volume on each of May11, 2015, May 20, 2015, and August 4-5, 205, as detailed herein.  These drops removed inflation from the price of Etsy shares, causing real economic loss to investors who had purchased Etsy shares during the Class Period.

167.    The decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Etsy shares negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors or company-specific facts unrelated to Defendants' fraudulent conduct.

168.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Etsy's share price and the subsequent significant decline in the value of Etsy shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### COUNT I
**(Against All Defendant Etsy and the Individual Defendants
For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

169.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170.    This Count is asserted against Defendant Etsy and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

171.    During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Etsy securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Etsy securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendant Etsy and the Individual Defendants, and each of them, took the actions set forth herein.

172.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the Prospectus, Registration Statement, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Etsy securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Etsy's finances and business prospects.

173.     By virtue, *inter alia*, of their positions and oversight roles at Etsy, the implication of the core operations of Etsy, and based on the CW allegations set forth herein, the Individual Defendants, along with Defendant Etsy, had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, such Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to such Defendants.  Said acts and omissions of such Defendants were committed willfully or with reckless disregard for the truth.  In addition, each such Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

174.     As discussed herein, the Individual Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Etsy securities from their personal portfolios. Defendant Etsy was motivated by the prospects of completing its IPO and garnering the proceeds therefrom, as described herein.

175.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Etsy, the Individual Defendants had knowledge of the details of Etsy's business and operations, internal controls, and financial performance, including without limitation the counterfeit and infringing products issues discussed herein and the related CW allegations as discussed herein.

176.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Etsy, including without limitation those made in the Prospectus and Registration Statement.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Etsy's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading Prospectus, Registration Statement, and public statements, the market price of Etsy securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Etsy's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Etsy securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

177.    During the Class Period, Etsy securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Etsy securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Etsy securities was substantially lower than the prices paid by Plaintiff and the

other members of the Class.  The market price of Etsy securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

178.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

179.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Etsy's securities during the Class Period, upon the corrective events outlined herein that incrementally revealed that Defendants had been disseminating material misrepresentations and omissions to the investing public.

**COUNT II**
**(Violations of Section 20(a) of the Exchange Act**
**Against The Individual Defendants)**

180.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

181.    During the Class Period, the Individual Defendants participated in the operation and management of Etsy, and conducted and participated, directly and indirectly, in the conduct of Etsy's business affairs.  Due, *inter alia*, to their senior positions and oversight roles, they knew the adverse non-public information about Etsy's business and operations, internal controls, and financial performance, including without limitation the counterfeit and infringing products issues discussed herein and the related CW allegations as discussed herein.

182.    As officers and/or directors of a company going public and thereafter publicly-owned, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Etsy's business, operations, financial condition and results, and to correct promptly any

75

public statements issued by Defendants which had become materially false or misleading.

183.    Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the Prospectus, the Registration Statement, press releases, SEC filings, and public statements which Etsy disseminated in the marketplace during the Class Period concerning Etsy's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Etsy to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Etsy within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Etsy securities.

184.    Each of the Individual Defendants, therefore, acted as a controlling person of Etsy. By reason of their senior management positions and/or being directors of Etsy, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Etsy to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Etsy and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

185.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, 15 §78t(a), for the violations committed by Etsy.

### COUNT III
### (Violations of Section 11 of the Securities Act
### Against All Defendants)

186.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187.     This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who purchased or otherwise acquired Etsy securities pursuant to or traceable to Etsy's IPO.   Each member of the Class acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Prospectus and Registration Statement.   Etsy is the issuer of the securities through the Prospectus and Registration Statement, on which the Individual Defendants were signatories.   The Underwriter Defendants are underwriters as contemplated by and required by Section 11(a)(5), 15 U.S.C. 77k(a)(5).

188.     Defendants issued and disseminated, and caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Prospectus and Registration Statement, which misrepresented or failed to disclose, among other things, the facts as set forth above.   By reason of the conduct alleged herein, each Defendants violated and/or controlled a person who violated Section 11 of the Securities Act, 15 U.S.C. §77k.

189.     Etsy is the issuer of the stock sold via the Prospectus and Registration Statement. As issuer of stock, Etsy is strictly liable to Plaintiffs and the Class members for the material misstatements and omissions contained therein.

190.     At the times they obtained their shares of Etsy, Plaintiffs and the members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

191.     This claim is brought within one year after discovery of the untrue statements and omissions in and from the Prospectus and Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Prospectus and Registration Statement.   It is therefore timely.

192.     At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Etsy securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.

193.     By reason of the foregoing, Plaintiffs and the other members of the Class are entitled to damages as measured by the provisions of Section 11(e), 15 U.S.C. 77K(e), from the Defendants and each of them, jointly and severally.

## COUNT IV
### (Violations of Section 12(a)(2) of the Securities Act
### Against All Defendants)

194.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

195.     By means of the defective Prospectus, Defendants Etsy, the Individual Defendants, and the Underwriter Defendants promoted and sold Etsy stock to Plaintiffs and the other Class members.

196.     The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants named in this claim owed Plaintiffs and the other Class members who purchased Etsy common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained therein to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  These Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as described herein above.

197.     Plaintiffs and the other Class members did not know, nor in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the

78

Prospectus at the time they acquired Etsy common stock.

198.   By reason of the misconduct alleged herein, these Defendants violated Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2).  As a direct and proximate result of such violation, Plaintiffs and the other Class members who purchased Etsy common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of the stock. Thus, Plaintiffs and the other Class members who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their Etsy shares, and hereby tender their common stock to Defendants sued herein.  Class members who have sold their Etsy common stock seek damages to the extent permitted by law.

## COUNT V
### (Violations of Section 15 of the Securities Act Against The Individual Defendants)

199.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

200.   This claim is asserted against the Individual Defendants, each of whom was a control person of Etsy at relevant times.

201.   The Individual Defendants were control persons of Etsy by virtue of, *inter alia*, their positions as senior officers and/or directors of Etsy, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Prospectus and the Registration Statement.

202.   None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus and Registration Statement were accurate and complete in all material respects.  Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

203.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Prospectus and Registration Statement and within three years after Etsy shares were sold to the Class in connection with the IPO.  It is therefore timely.

204.    By reason of the above conduct, for which Etsy is primarily liable, as set forth above, the Individual Defendants are jointly and severally liable with and to the same extent as Etsy pursuant to Section 15 of the Securities Action, 15 U.S.C. 77o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff and the other named Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay, jointly and severally, the damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein, in an amount to be proven at trial;

C.    Awarding Plaintiffs and the Class rescission or a rescissionary measure of damages;

D.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

E.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: January 21, 2015

Respectfully submitted,
**POMERANTZ, LLP**

By:  _/s/ Matthew L. Tuccillo_____
Jeremy A. Lieberman
Matthew L. Tuccillo

600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665


**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

**BRONSTEIN GEWIRTZ & GROSSMAN LLP**

Peretz Bronstein
60 E. 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile:  (212) 697-7296
Email: peretz@bgandg.com

*Attorneys for Plaintiffs*