UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SALEH ALTAYYAR, MARY M. GILTENAN, and ANDREW HUANG, Individually and On Behalf Of All Others Similarly Situated,

Plaintiffs,

– against –

ETSY, INC., CHAD DICKERSON, KRISTINA SALEN, JAMES W. BREYER, M. MICHELE BURNS, JONATHAN D. KLEIN, FRED WILSON, GOLDMAN SACHS & CO., MORGAN STANLEY & CO. LLC, ALLEN & COMPANY LLC, LOOP CAPITAL MARKETS LLC, THE WILLIAMS CAPITAL GROUP, L.P.,

Defendants.

**MEMORANDUM DECISION AND ORDER**

15-cv-2785 (AMD) (RER)

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ MAR 1 6 2016 ★
BROOKLYN OFFICE

**ANN M. DONNELLY**, District Judge.

## INTRODUCTION

On May 13, 2015, Mary M. Giltenan, Saleh Altayyar, and Andrew Huang, on behalf of themselves and all others similarly situated, filed this class action complaint against Etsy, Inc. ("Etsy"), Etsy's Chief Executive Officer ("CEO") Chad Dickerson, Chief Financial Officer (CFO) Kristina Salen, and Directors James Breyer, M. Michele Burns, Jonathan Klein and Fred Wilson [collectively, "individual defendants"], Goldman Sachs & Co. ("Goldman"), Morgan Stanley & Co. ("Morgan Stanley"), Allen & Company LLC ("Allen"), Loop Capital Markets

LLC ("Loop"), and The Williams Capital Group, L.P. ("Williams") [collectively, "underwriter defendants"].

On January 28, 2016, the plaintiffs filed a revised amended complaint ("RAC") alleging that the defendants made statements and omissions that artificially inflated Etsy's stock price, causing the plaintiffs to suffer a loss when the fraud was revealed and the market value dropped. (RAC, ECF 43 ¶¶ 4-20.) The plaintiffs claim that Etsy and the individual defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) (Count I), that the individual defendants violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) (Count II) and Section 15 of the Securities Act, 15 U.S.C. § 77o (Count V), and that all defendants violated Sections 11 and 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77(k), 77*l*(a)(2) (Counts III-IV).

On April 5, 2016, the defendants moved to dismiss the complaint on the ground that it fails to "state with particularity the circumstances constituting fraud," as required by Federal Rule of Civil Procedure 9(b), or meet the heightened pleading requirement imposed by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). For the reasons stated below, I grant the defendants' motion and dismiss the complaint with prejudice.

## BACKGROUND

The following facts, taken from the complaint and documents referenced therein, are assumed to be true for purposes of this motion, and are read in the light most favorable to the plaintiffs. *See, e.g.*, *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

### I. Etsy's History and Initial Public Offering

The plaintiffs are investors who acquired Etsy securities between April 16, 2015, the date of its initial public offering ("IPO") and August 4, 2015. (RAC ¶ 1.) Etsy, a Brooklyn-based

company, operates a website that connects buyers and sellers of handmade and vintage goods, as well as craft supplies. (*Id.* ¶¶ 2, 49-50.) Etsy defines these categories to include, respectively, items of a seller's own creation, items that are at least 20 years old, and tools that are used to create new handmade items. (*Id.* ¶ 57.) Etsy charges sellers a listing fee, transaction fees, and fees for services including prominent product placement, shipping labels, and payment processing. (*Id.* ¶¶ 53, 113.) Accordingly, Etsy's market performance depends, in part, on the "[g]rowth and [r]etention" of participating sellers and buyers. (*Id.* ¶ 54); *see also* Declaration of Kayvan B. Sadeghi ("Sadeghi Decl."), Dkt. 70, Ex. 4 ("Etsy Prospectus") at 69 ("[W]e view the number of active sellers as a key indicator of the awareness of our brand, the reach of our platform, the potential for growth in GMS and revenue and the health of our ecosystem.")).

In 2012, Etsy sold 11,594,203 shares of Series F preferred stock to investors, who thereby became equity holders. (*Id.* ¶ 102.) Defendant Breyer is the founder and CEO of Breyer Capital, which acquired 552,105 shares for $1.9 million. (*Id.*) He is also a partner in Accel Partners, which acquired 4,968,944 shares for $17.1 million. (*Id.*) Defendant Wilson is a partner in Union Square Ventures, which acquired 1,380,262 for $4.7 million. (*Id.*) Additionally, Defendant Dickerson and other "Etsy executives…tendered an aggregated of 2,144,881 shares of Etsy capital stock." (*Id.*) Out of this amount, Accel Partners purchased 919,510 shares for $6.2 million, Union Square Ventures purchased 255,241 shares for $1.7 million, and Breyer Capital purchased 102,096 for $697,000. (*Id.*) Ultimately, through its IPO, Accel Partners received $39,931,800 for selling 2,669,238 shares of Etsy stock—2,165,950 of which defendant Breyer beneficially owned—and Union Square received $22,547,024 for selling 1,507,154 shares—all

beneficially owned by defendant Wilson. (*Id.* ¶ 108.) Per the underwriter discount on all shares offered in the IPO, the underwriter defendants made $19.9 million dollars. (*Id.* ¶ 109.)

When Etsy went public, it filed a Prospectus and Registration Statement that set forth its commitment to working solely with "responsible, small-batch manufacturing partners" and "manufacturers who adhere to [Etsy's] ethical expectations." (*Id.* ¶ 4.) The statement explained the company's methods for safeguarding against counterfeit goods, including the use of "machine learning, automated systems and community-generated queries and flags to review items and shops that may be in violation of [Etsy's] policies." (*Id.* ¶ 5.) These policies included Etsy's Terms of Use agreement, which prohibited buyers and sellers from posting content or using the website in a way that "involve[d] the sale of illegal, counterfeit or stolen items" or "[i]nfringe[d] upon any third-party's copyright, patent, trademark, trade secret, or other proprietary or intellectual property rights." (*Id.* ¶ 56.) Additionally, Etsy published a Copyright and Intellectual Property Policy notifying customers that it had the right to remove infringing material and discontinue service to offending users. (*Id.* ¶ 58.)

Etsy's Board, which included the individual defendants, was charged with risk-management. (*Id.* ¶ 59.) Defendants Burns, Klein and Wilson were members of the Board's Audit Committee, which was responsible for overseeing Etsy's financial statements, compliance with legal and regulatory requirements, and disclosure procedures. (*Id.* ¶ 60.)

II. <u>Wedbush Securities Note</u>

On May 11, 2015, an equity analyst at Wedbush Securities ("Wedbush") downgraded Etsy to "Underperform." (*Id.* ¶ 133.) This assessment was based on Wedbush's "research indicat[ing] that as many as 2 million items on Etsy (>5% of all merchandise) may potentially be

either counterfeit or constitute trademark or copyright infringement" and that "Etsy ha[d] become a go-to destination for counterfeits." (*Id.*) The note went on to say that intellectual property lawyers advised Wedbush that "questionable seller practices" could limit Etsy's growth. (*Id.*) After several news outlets reported on the Wedbush note, Etsy's share price fell to $1.86. (*Id.* ¶¶ 133-34.)

On May 19, 2015, Etsy filed a Form 8-K with the SEC and issued a press release announcing its first quarter earnings for 2015. (*Id.* ¶ 135.) Etsy reported gross merchandise sales ("GMS") of $531.9 million, with a "stagnant active seller base of 1.4 million members" and a drop in revenue from $64.9 million the previous quarter to $58.5 million, as well as other metrics by which it fell short of initial expectations. (*Id.*) The following day, Wedbush and Morgan Stanley issued Notes interpreting these figures and questioning Etsy's prospects for growth. (*Id.*) Etsy's stock price fell 18.1 percent. (*Id.* ¶ 136.)

On August 4, 2015, Etsy filed a Form 8-K with the SEC and issued a press release announcing its second quarter earnings for 2015. (*Id.* ¶ 141.) It announced GMS of $546.2 million—a $14.3 million increase from the prior quarter—with an active seller base of "nearly 1.5 million members." (*Id.*) Wedbush noted that Etsy's sharp increase in marketing did not speed up growth, which had slowed down progressively for the three quarters. (*Id.*) A Wedbush analyst hypothesized that the metrics might indicate "dilution of the brand by potentially counterfeit and mass manufactured items…especially as seller[s] shift their items to *Handmade at Amazon*." (*Id.*) Etsy's stock price fell again. (*Id.* ¶ 142.)

III. Confidential Witnesses

Relying on six confidential witnesses ("CWs"), the plaintiffs assert that Etsy's management knew its compliance practices were flawed before its IPO. (RAC ¶¶ 8-13, 43-48, 62-99.) Each of the CWs worked at Etsy between September of 2013 and May of 2015: CWs 1 and 2 served on the Integrity Team, which was responsible for enforcing Etsy's counter-infringement policies, between October of 2013 and January of 2015; CW 3 worked at Etsy from September of 2013 to August of 2014 as a member advisor, responding to infringement complaints and other emails from Etsy users; CW 4 was Etsy's Chief Marketing Officer from January of 2014 through July of 2014; CW 5 was an operations agent who handled credit card disputes and payment fraud from December of 2013 through May of 2015; and CW 6 was a data analyst from January of 2013 through January of 2015. (*Id.* ¶¶ 43-48.)

According to CW 3, Etsy relied on rights-holders to complain about infringement and then required them to go through a cumbersome process before removing the allegedly counterfeit products. (*Id.* ¶ 66.) Etsy's Integrity Teams consisted of between 8 and 75 employees who were responsible for reviewing a "massive volume" of user complaints. (*Id.* ¶¶ 61-66 (CWs 1 and 2).) Even after an item was reported as counterfeit, it would still appear on the site if it passed Etsy's "handmade inquiry" and if the rights-holding company did not file a complaint. (*Id.* ¶¶ 67-75 (CW 1).) When rights-holders did complain, they had to submit proof of infringement to Etsy's legal department and identify the allegedly infringing products by item number; if a seller re-posted the infringing items under different identification numbers, the rights-holder had to go through the process all over again. (*Id.* ¶¶ 75-77 (CW 2).)

CW 1 reported that Etsy's internal system for reporting counterfeit items was equally inefficient. The company employed a quota system that discouraged employees from comprehensively investigating complaints. (*Id.* ¶ 81.) Each Integrity Team member was required to initiate a certain number of investigations each day: if a member identified and shut down an infringing account, that would count as one investigation for purposes of the numerical quota; she would not get credit for closing any additional accounts associated with that seller. (*Id.*) Since the team members' job performance evaluations were based in part on their ability to meet the numerical quota, the plaintiffs argue, employees had no incentive to conduct additional investigations into each infringing seller. (*Id.*) According to CW1, popular or revenue-generating sellers "were allowed to continue selling even if they did not meet company policy regarding their products." (*Id.* ¶ 82.) For example, CW1 recalled that one seller listed factory-purchased clothing items, but Etsy directed its employees not to "mess with that shop" because of its popularity. (*Id.*)

Finally, the CWs reported that managers were aware of compliance issues, but did not devote sufficient resources to the Integrity Team or take other measures to address these problems. CW 6 and CW 4 reported that employees raised concerns about infringement at meetings with Etsy managers, and that the Integrity Team prepared "fraud reports" that were available to managers as well. (*Id.* ¶¶ 88-92.) CW1 reported that the Integrity Team was instructed not to tell other employees about "fraudulent behavior." (*Id.* ¶ 93.) CW 2 reported that the company considered "implementing a vetting process for sellers" to reduce infringement, but ultimately decided against it. (*Id.* ¶ 95.) CW 2 "was not satisfied with Etsy's response" to the number of rights-infringing goods on its website and raised these concerns with a supervisor,

asking "about what Etsy was doing to address the problems better." (*Id.* ¶ 97.) In what CW 2 perceived as retaliation for speaking out about infringement, CW 2 was terminated: "I was let go because I was asking a lot of questions." (*Id.*)

IV. False and Misleading Statements

Based on these accounts and the Wedbush and Morgan Stanley notes, the plaintiffs claim that Etsy's Prospectus and Registration Statement contained false and misleading information regarding its values, business operations and performance metrics.

The Prospectus stated that "[h]andmade goods are the foundation of [Etsy's] marketplace" and that Etsy employees helped preserve the company's "ecosystem" of "creative entrepreneurs." (RAC ¶ 116; *see also* Etsy Prospectus at 96.) It touted the company's commitment to staying "genuine" and remaining "true to [its] values" as well as its "authentic, trusted marketplace," and said that Etsy employees worked to ensure that Etsy sellers "adhere[d] to [the company's] ethical expectations: humane working conditions, non-discrimination policies, sustainability practices, and no child, youth, or involuntary labor." (RAC ¶¶ 120-23; *see also* Etsy Prospectus at 106, 99.) In sum, the Prospectus emphasized that Etsy works primarily with small businesses and lists goods that could be described as vintage, handmade, or craft supplies. (RAC ¶¶ 123-29; *see also* Etsy Prospectus at 97-122.)

The plaintiffs assert that Etsy misrepresented its commitment to working with artisans, entrepreneurs, and small-batch manufacturers. Instead, they argue, Etsy's marketplace included a large number of manufacturers who mass-produced counterfeit goods at warehouses and that Etsy took a lackluster approach to ensuring compliance with its stated policies. According to the plaintiffs, the defendants were aware of Etsy's infringement problems before the IPO, yet the

Prospectus set forth Etsy's values and compliance practices as if they were strong and intact. (*Id.* ¶¶ 83-89, 98.) Furthermore, the Wedbush Note stated that over five percent of Etsy's merchandise was counterfeit or otherwise rights-infringing, but the Prospectus counted these counterfeit sellers as regular Etsy users. (*Id.* ¶¶ 128-30.) Accordingly, the plaintiffs argue that the Prospectus overstated the total number of members and active sellers and the amount of total sales and revenue; likewise, they argue that the prospectus understated the cost of revenue, as well as the company's net loss and expenses. (*Id.* ¶¶ 131-32.)

Finally, the plaintiffs claim that the defendants made additional false and misleading statements in order to correct the stock price drop after the Wedbush and Morgan Stanley Notes shed doubt on Etsy's outlook. (*Id.* ¶¶ 137-38.) On a May 20, 2015 call with analysts, defendant Dickerson represented that Etsy followed "best practices" and was "aggressive" in its effort to ensure that sellers complied with its anti-infringement policies. (*Id.* ¶ 138.) He assured the analysts that Etsy's legal support team was responsive to takedown notices, that it terminated accounts of repeat offenders, and that it employed technology to bar "bad actors" from returning. (*Id.*) The plaintiffs contend these statements were false and misleading and that, in fact, Etsy maintained a "lax" approach to compliance, doing "the bare minimum" to address infringement. (*Id.* ¶ 139.)

According to the plaintiffs, the defendants' misstatements artificially inflated Etsy's stock price, which dropped following the issuance of the Wedbush and Morgan Stanley Notes, and the company's earnings reports on May 11, May 20, and August 4-5 of 2015, causing them to suffer economic loss. (*Id.* ¶¶ 167-69.)

## DISCUSSION

### I. Standard of Review

Generally, in order to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In a securities fraud case, the court may consider "any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the [Securities and Exchange Commission (SEC)], and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015) (internal alterations omitted).

Additionally, a plaintiff alleging securities fraud must comply with the heightened pleading requirements imposed by Rule 9(b) and the PSLRA. Under Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud." Fed. R. Civ.P. 9(b). "[T]o satisfy this requirement the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir. 2004)). Under the PSLRA, a securities fraud plaintiff must "specify each misleading statement," explain why the statement is misleading, and "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind." *Id.* (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (internal quotation marks and alterations omitted)); *see also* 15 U.S.C. § 78u–4(b)(1), (2)).

**II. Exchange Act Claims**

The Exchange Act provides for both "primary liability," through Section 10(b), 15 U.S.C. § 78j(b), and "secondary liability"—also known as "controlling person liability"—through Section 20(a), 15 U.S.C. § 78t(a). *Levy v. Maggiore*, 48 F. Supp. 3d 428, 439–40 (E.D.N.Y. 2014) (citations omitted). The plaintiffs claim that Etsy and the individual defendants violated Section 10(b) and its implementing regulation, Rule 10b-5 (Count I) and that the individual defendants violated Section 20(a) (Count II).

"Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to 'use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of [the] rules and regulations' that the SEC prescribes." *Stratte-McClure*, 776 F.3d at 100 (citing 15 U.S.C. § 78j); *see also* 17 C.F.R. § 240.10b–5. To state a cause of action under Section 10(b) or its implementing regulation, Rule 10b-5, a plaintiff must allege that each defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Stratte-McClure*, 776 F.3d at 100 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007)).

Under Section 20(a) of the Act, "every person who, directly or indirectly, controls any person directly liable under the Securities Exchange Act" is also liable. *Levy*, 48 F. Supp. 3d, at

439–40 (citing *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 371 (2d Cir. 2014) (internal quotation marks and alterations omitted) (quoting 15 U.S.C. § 78t)). A party cannot be held both primarily and secondarily liable for Exchange Act violations, but a plaintiff may allege both as alternative theories of liability at the pleading stage. *Id.* at 440 (citing *Szulik v. Tagliaferri*, 966 F.Supp.2d 339, 368–69 (S.D.N.Y. 2013); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)).

**A. Material Misrepresentation**

As discussed above, the plaintiffs allege that Etsy's Prospectus and Registration Statement included false and misleading statements regarding its values, its counter-infringement policies and practices, and its performance metrics. The defendants argue that Etsy's statements were neither false nor material.

To state the obvious, the falsity of Etsy's statements depends on whether the statements were "just that: false; in error; wrong." *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, No. 13 CIV. 1307 KBF, 2014 WL 585658, at *10 (S.D.N.Y. Feb. 14, 2014). Omissions are the equivalent of false statements if the defendant presented information that was misleading because of those omissions. *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013). A plaintiff challenging misrepresentations of opinion, rather than fact, must allege that the statement was "both objectively false and disbelieved by the defendant at the time it was expressed." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011).

A statement or omission is material if "a reasonable investor would have considered it significant in making investment decisions." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000) (citations omitted). It is not enough to suggest that an "investor might have

considered the misrepresentation or omission important." *Id.* at 162. Instead, "courts must engage in a fact-specific inquiry" and determine whether there was "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available[]'" to the investor. *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

Since "[m]ateriality is a mixed question of law and fact," the Second Circuit has held that courts should not grant a 12(b)(6) motion to dismiss "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162 (citation omitted).

1. Etsy's Values

The plaintiffs claim that Etsy made material misstatements or omissions about its "values."[1] They cite the following statements:

- Handmade goods are the foundation of our marketplace. Whether crafted by an Etsy seller herself, with the assistance of her team or with an outside manufacturer in small batches, handmade goods spring from the imagination and creativity of an Etsy seller and embody authorship, responsibility and transparency....Our community is made up of creative entrepreneurs who sell on our platform, thoughtful consumers looking to buy unique goods in our marketplace, responsible manufacturers who help Etsy sellers grow their businesses and Etsy employees who maintain our platform and nurture our ecosystem. (Am. Compl. ¶ 117.)

[1] The complaint includes excerpts of full paragraphs from the Prospectus and highlights certain sentences. I have considered the full excerpts but, for economy, reproduce the highlighted portions.

- Our values are integral to everything we do. We are a mindful, transparent and humane business… Etsy sellers in particular depend on us and on our platform to grow their businesses, so we will strive to make decisions that are best for the long-term health of our ecosystem…approach the work we do with the same care and inspiration as do Etsy sellers... We strive to stay genuine, maintaining integrity, humility and sincerity in everything we do. When we feel that we are not being true to our values or our mission, we are not afraid to stop and change course. (*Id.* ¶ 119.)

- We have built an authentic, trusted marketplace that embodies our values-based culture…. We have developed a reputation for authenticity as a result of Etsy sellers' unique offerings and their adherence to our policies for handmade goods embodying the principles of authorship, responsibility and transparency. … The authenticity of our marketplace and the connections among people in our community are the cornerstones of our business. (*Id.* ¶ 121.)

According to the plaintiffs, these statements misrepresented the "authenticity and trustworthiness of Etsy's marketplace as a key 'strength' credited with helping Etsy achieve its scale." (*Id.*) Clearly, though, no reasonable investor would see these statements as anything other than aspirational and vague. They constitute "precisely the type of puffery" that the Second Circuit has held to be non-cognizable under the Exchange Act. *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050, 2010 WL 3790810, at *24 (S.D.N.Y. Sept. 28, 2010) ("Statements about corporate culture and integrity are typically considered to be inactionable puffery.").

Words like "mindful," "humane," "genuine," and "authentic" are not quantifiable or factual; they are subject to interpretation, within reason, and are statements of opinion. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S.Ct. 1318, 191 L.Ed. 2d 253 (2015), the Supreme Court distinguished between statements of opinion and statements of

fact: "[A] statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not." *Id.* at 1325 (citing Webster's New International Dictionary 782 (1927)). Thus, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong" and the Securities Act's prohibition on untrue statements of material fact "does not allow investors to second-guess inherently subjective and uncertain assessments." *Id.* at 1327; *see also Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 645 F. App'x 72, 75 (2d Cir. 2016) ("It is only with the benefit of hindsight that these records can be characterized as red flags, but allegations of 'fraud by hindsight' are insufficient.") (citation omitted), *cert. denied*, 137 S. Ct. 186, 196 L. Ed. 2d 126 (2016).[2]

The Court emphasized that an issuer's statements must be construed in "context." *Omnicare*, 135 S.Ct. at 1330. "An opinion statement… is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way," because "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts[.]" *Id.* at 1329. A reasonable investor reads each statement in an offering document "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Id.* at 1330. Accordingly, "an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.*

[2] The plaintiffs contest the sincerity of the defendants' stated opinions but, as discussed further above, their allegations are insufficient.

The plaintiffs' allegations might show that Etsy's compliance practices were imperfect—perhaps even awful—and that its managers knew of ongoing infringement problems. The plaintiffs do not, however, establish that the challenged values statements were objectively false or disbelieved when Etsy made them. *See Fait*, 655 F.3d, at 110. Furthermore, the cases the plaintiffs cite do not support their claim that these statements are more than mere puffery. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 573 (S.D.N.Y. 2011) (statements that company was on "sound financial footing," and had "zero net debt," and "free cash flow" were more than puffery); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 290, 319 (S.D.N.Y. 2013) (defendants' statement that "the Company maintains a strong liquidity position" was more than mere puffery where the plaintiffs, relying on several federal regulatory reports, argued that the defendant company, among other things, "inflated its profits by recording deferred tax assets on its balance sheet even in light of evidence..[it] would never realize those assets; engaged in a high-risk strategy of investing in European sovereign debt while simultaneously concealing the size of and risk posed by those investments; repeatedly increased its European sovereign debt investments, in spite of concerns expressed on numerous occasions by its chief risk assessment officer and in violation of the company's own trading limits…fired a chief risk officer who questioned whether [their] investment strategy was prudent …and used intra-day transfers from various MF Global accounts, including those involving customer funds, to cover increasing liquidity demands."); *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190–91 (S.D.N.Y. 2010) (statements such as "we are seeing significant organic growth in cash, assets and credit" and "we enter 2007 ideally positioned to capitalize on secular growth trends in the industry" were actionable in light of allegations that "the vast majority of

E*TRADE's loans were purchased from questionable outside lenders," that there was "internal distress" at the company and that an executive admitted in December 2006 that he "expected profits to be down then and throughout 2007.").

The plaintiffs make much of Wedbush's estimate that over five percent of the items listed on Etsy's website are counterfeit or otherwise infringe intellectual property rights, but there is nothing objectively unreasonable about valuing authenticity and believing that Etsy was authentic, even if the defendants knew that Etsy could not exclude all non-compliant items from its platform. In other words, Etsy may have aspired to be authentic, and even had a reputation for it, without achieving one hundred percent authenticity at all times. Similarly, the defendants may have known that there were individual failings, yet still believed that their vision of authenticity was largely a reality.

The plaintiffs may disagree with the defendants' opinions, but disagreement does not render the opinions false. "Section 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception." *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir. 1982) (citing *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473, 479, 97 S.Ct. 1292, 1300, 1304, 51 L.Ed.2d 480 (1977); *Rodman v. Grant Found.*, 608 F.2d 64, 72 (2d Cir. 1979)); *see also, e.g., In re Educ. Servs., Inc. Sec. & Shareholder Deriv. Litig.*, 859 F. Supp. 2d 572, 581 (S.D.N.Y. 2012) (finding that "allegations of specific instances of unethical or fraudulent practices" did "not render…broad statements regarding compliance misleading.").

Taking the Prospectus as a whole, the defendants' statements about Etsy's values were not misleading. As discussed below, the vague statements about authenticity and "mindfulness"

were surrounded by more definite statements about Etsy's actual compliance practices, as well as warnings about the limits of its ability to prevent all counterfeiters from gaining access to its site. Viewed in context, the plaintiffs' allegations do not show that the challenged values statements were misleading.

2. Etsy's Compliance Policies and Practices

The plaintiffs also challenge the following statements about Etsy's compliance policies and practices. Again, they fail to plead that the statements were false.

- Our policies are designed to give the Etsy buyer the comfort that she is purchasing unique goods from a small business that adheres to certain principles. Most fundamentally, we require that goods listed in our marketplace be handmade, vintage or craft supplies. …We enforce our policies through the following: Integrity team: We use a combination of machine learning, automated systems and community-generated queries and flags to review items and shops that may be in violation of our policies. Trust and Safety team. Our Trust and Safety team uses human review and sophisticated automated tools and algorithms to detect fraud. We cancel transactions if fraud is detected, and we strive to prohibit bad actors from using our platform. (RAC ¶ 125.)

- Although we do not create or take possession of the items listed in our marketplace by Etsy sellers, we frequently receive communications alleging that items listed in our marketplace infringe third-party copyrights, trademarks, patents or other intellectual property rights. We have intellectual property complaint and takedown procedures in place to address these communications, and we believe such procedures are important to promote confidence in our marketplace. We follow these procedures to review complaints and relevant facts to determine whether to take the appropriate action, which may include removal of the item from our marketplace and, in certain cases, closing the shops of Etsy sellers who repeatedly violate our policies. (*Id.*)

- [W]e believe that our strength and business success rest in the interdependence among Etsy sellers, Etsy buyers, responsible manufacturers and our employees…The vast majority of sellers on Etsy are one-person shops…I have heard concerns that by allowing our sellers to partner with responsible manufacturers, we are diluting our handmade ethos. I share our community's desire to preserve what is special about Etsy. After all, Etsy has always served as an antidote to mass manufacturing. We still do. With our vision of responsible manufacturing, we are promoting a new, people-centered model in

> which artisans can preserve the spirit of craftsmanship and grow responsibly by collaborating with people at small-batch manufacturers to make their goods. (*Id.* ¶ 127.)

The CW accounts of Etsy's practices are largely consistent with the Prospectus's description of Etsy's compliance practices. CWs 1 and 2 reported that Etsy users "flagged" potentially infringing items, and that Etsy's team conducted "sweeps" to detect fraud. (*Id.* ¶ 68.) The Integrity Team worked to "get on top of things as quickly as possible." (*Id.* ¶ 66.) In response to complaints, Etsy removed specific products; if a seller was found to have violated a trademark three times, Etsy expelled the user from the site. (*Id.* ¶¶ 75-77.) Etsy's process is compliant with the Digital Millennium Copyright Act. (*Id.* ¶ 138; *see also Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 30 (2d Cir. 2012) (addressing standard for copyright infringement); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 108-09 (2d Cir. 2010) (similar standard for trademark infringement)). The plaintiffs' complaint is not with the Prospectus's description of Etsy's compliance practices, but rather its representation of the strength of those practices.

As discussed above, the challenged statements must be interpreted in the context of the Prospectus as a whole. *See Omnicare, Inc.* 135 S.Ct. at 1330. In context, the challenged statements are not misleading, and it is only by ignoring the Prospectus's clear limiting language that the plaintiffs can say that they are. The Prospectus represented that Etsy would "strive" to make decisions in the company's interest and that when Etsy managers "fe[lt] that [the company was] not being true to [its] values…[they were] not afraid to stop and change course." (RAC ¶¶ 119-20.) Words such as "strive," "feel" and "not afraid" are not guarantees; the Prospectus is clear that Etsy managers would make business decisions according to their discretion.

Similarly, the plaintiffs' argument that the Prospectus falsely "touted Etsy's procedures as sufficient to 'promote confidence' in the marketplace" is belied by the language of the Prospectus: Etsy "*believe*[*d*] such procedures [we]re *important* to promote confidence in [the] marketplace" and that they "strive to prohibit bad actors from using [Etsy's] platform." (*Id.* ¶ 125) (emphasis added). The clear import of the statement is that Etsy established a complaint and takedown procedure as an effort to keep bad actors out, but neither promised any particular user pre-screening nor guaranteed that their process would be absolutely effective.

Moreover, the Prospectus explicitly acknowledged that Etsy's compliance practices were imperfect, and that sellers might not conform to Etsy's policy guidelines. It stated that Etsy could not "control Etsy sellers" and that Etsy's "reputation [might] be harmed" if sellers "engage[d] in illegal or unethical business practices." (Etsy Prospectus at 26.) Additionally, the Prospectus cautioned that Etsy's fraud detection methods might "not always be effective," (*Id.* at 35), and that Etsy's complaint and takedown process might "not effectively reduce or eliminate [its] liability." (*Id.* at 39.) A reasonable investor, looking at the entire prospectus, would not be misled by the language that the plaintiffs challenge. *See, e.g. Christine Asia Co. v. Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 471-74 (S.D.N.Y. 2016) (finding that offering documents were not misleading when, among other things, they disclosed that the defendant company "received complaints about intellectual property infringement on its sites, and…warned investors that it might be accused of facilitating such conduct in the future.").

3. Etsy's Listings

The plaintiffs claim that the Prospectus misstated the extent to which Etsy's platform conformed to the company's vision of an authentic, artisan-based marketplace. They challenge the following statements:

- Etsy Sellers: Creative Entrepreneurs …We support a diverse group of artists, makers, designers and collectors from around the world – from the solo artisan to the full-time jewelry maker with staff; from the antique furniture collector to the textile graphic designer partnering with a smallbatch manufacturer. Etsy sellers range from hobbyists to professional merchants, and have a broad range of personal and professional goals... (RAC ¶ 123.)

- Responsible Manufacturers: We are committed to helping Etsy sellers who want to work with responsible, small-batch manufacturing partners… We ask Etsy sellers to work with manufacturers who adhere to our ethical expectations: humane working conditions, non-discrimination policies, sustainability practices and no child, youth or involuntary labor. As of December 31, 2014, we had approved more than 3,000 Etsy shops for over 5,000 manufacturing partnerships. (*Id.*)

- Etsy Employees: We too are members of our community. Whether crafting our policies, talking with Etsy sellers and Etsy buyers in our online forums or building the tools and services underlying our marketplace, our employees create lasting, authentic connections in our community. Etsy employees emphasize building personal relationships with Etsy sellers, visiting their shops, inviting them to our offices for lunch or celebrating with them at in-person events. (*Id.*)

These statements, like the other challenged statements, would not mislead any reasonable investor. The statements use similarly imprecise and fuzzy words—"sustainability," "lasting," "humane," "diverse"—and cite no numbers that contradict or undermine the figures in the Prospectus. While it may be, as the plaintiffs claim, that a "large portion" of Etsy sellers were not compliant with Etsy's policy guidelines (*Id.* ¶ 124), that says nothing about the veracity of the statement that a vast majority of sellers were "one-person shops" or that Etsy employees

"emphasize building personal relationships with Etsy sellers." (*Id.* ¶¶ 127-28.) The Prospectus did not guarantee that all sellers would fit Etsy's ideal mold; rather, it stated that Etsy was "committed" to this vision and "ask[ed]" its sellers to comply. (*Id.* ¶ 123.) "Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (citing *Shields v. Citytrust Bancorp*, Inc., 25 F.3d 1124, 1129–30 (2d Cir. 1994)).

Additionally, the Prospectus's description of Etsy sellers was clearly intended to serve as an illustrative list of examples, rather than an exhaustive description of every seller on the website. The defendants were entitled to highlight the sellers that best suit Etsy's brand. *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also, e.g.*, *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152–53 (2d Cir. 2013) ("[I]t bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information… "[d]isclosure is required ... only when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'") (quoting *Matrixx Initiatives, Inc. v. Siracusano,* —— U.S. ——, 131 S.Ct. 1309, 1321, 179 L.Ed.2d 398 (2011)).

4. Etsy's Performance Metrics and Financial Results

The plaintiffs argue that the performance metrics reported in the Prospectus were false and misleading. They challenge the following statements:

- Etsy had 54.0 million members as of December 31, 2014;

- Etsy had 1.4 million active sellers as of December 31, 2014, up 26.0% from 1.1 million as of December 31, 2014;
- Etsy sellers generated GMS of $1.93 billion in 2014, up 43.3% over 2013 GMS of $1.35 billion;
- Etsy generated total revenue of $195.6 million in 2014, up 56.4% over 2013 revenues of $125.0 million where "[o]ur revenue is record net of actual and expected refunds";
- Etsy's total 2014 revenues included $108.7 million in Marketplace revenues, up 38.4% from $78.5 million in 2013, which Etsy attributed as 'primarily a result of an increase in the amount of transaction fees received and an increase in listings from new and existing Etsy sellers with a corresponding increase in listing fees received';
- Etsy's total 2014 revenues included $82.5 million in Seller Services revenues, up 92.7% from $42.8 million in 2013, which Etsy attributed as "primarily driven by an increase in revenue from Direct Checkout services, as well as increases in Promoted Listings and Shipping Labels;
- Etsy's cost of revenue in 2014 was $73.6 million, up 54.1% from $47.7 million in 2013;
- Etsy generated a net loss of $15.2 million from a gross profit of $121.9 million in 2014;
- Etsy generated adjusted EBITDA of $23.1 million, compared to $16.9 million in 2013, in 2014;
- Etsy incurred $39.7 million in marketing expenses in 2014, up 122.2% from $17.8 million in 2013, which Etsy attributed as 'primarily as a result of an increase in search engine marketing from Google product listing ads and, to a lesser extent, from an increase in employee related costs resulting from increased headcount in our marketing team, which include our public relations and communications teams.'

(RAC ¶ 130.) The plaintiffs do not contest the accuracy of these figures *per se*; rather, they argue that these figures were false and misleading because the reported numbers were based on a platform that was "heavily made up of large-scale counterfeiters and sellers infringing on property rights." (*Id.* ¶ 132.) Thus, the "actual number of members and active sellers" and "Etsy's GMS, total revenues, Marketplace revenues, Seller Services revenues, and EBITDA, less fees and revenues derived from the listing, advertising, selling, and shipping of counterfeit and

infringing items, were all substantially less than reported, while net loss was substantially greater than reported." (*Id.*)

Under Second Circuit case law, the plaintiffs' arguments are "easily rejected." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012). In *Boca Raton Firefighters*, a pension fund purchased stock from McGraw-Hill and then sued the company for allegedly making false statements. *Id.* at 33. They challenged McGraw–Hill's financial reports on the ground that "the overly positive statements describing those numbers were misleading in light of the concealed manner in which they were achieved." *Id.* at 35. They argued that "McGraw–Hill's statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-term unsustainability of its business model." *Id.* at 38. In dismissing the complaint, the District Court rejected this argument—a decision the Second Circuit affirmed, noting that "[w]hatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings." *Id.* (citing *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 108 (2d Cir. 1998)).

The plaintiffs make the far-fetched claim that the defendants should have used a particular method for calculating their financial metrics and that they knowingly declined to use that method. Notably, they do not propose an alternative calculation. Assuming for the sake of argument that the defendants could have accounted for infringement in its metrics, the defendants' calculation method was not so unreasonable as to support an inference that their figures were misleading.

On the contrary, the defendants explained their methodology and supplied the plaintiffs with all the information they needed to assess the reported financial results. The Prospectus explained that Etsy received infringement complaints, removed infringing products in response to those complaints, and removed sellers who repeatedly violated Etsy's policies. (Etsy Prospectus at 30-31.) It defined "active sellers" as follows:

> An active seller is an Etsy seller who has incurred at least one charge from us in the last 12 months. Charges include transaction fees, listing fees and fees for Direct Checkout, Promoted Listings, Shipping Labels and Wholesale enrollment. An Etsy seller is a member who has created an account and has listed an item in our marketplace. An Etsy seller is identified by a unique e-mail address; a single person can have multiple Etsy seller accounts. We succeed when Etsy sellers succeed, so we view the number of active sellers as a key indicator of the awareness of our brand, the reach of our platform, the potential for growth in GMS and revenue and the health of our ecosystem.

(Etsy Prospectus at 8.) Thus, the Prospectus, after acknowledging the possibility of infringement, did not suggest that the defendants would adjust the total number of sellers according to estimated infringement rates or use some other calculation to determine its financial metrics. Likewise, the definition of GMS did not represent that the reported GMS had been adjusted for infringement. (*Id.*) Investors were thus apprised of the potential that infringing sellers might be included in the number of total sellers listed in Etsy's financial report.

The plaintiffs had no reason to believe that the defendants would adjust the financial metrics to account for infringement, and they provide no basis for the assertion that the deliberately failed to do so in order to mislead investors. To put it simply, "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca*

*Raton*, 506 F. App'x, at 39 (quoting *In re Sofamor Danek Group*, Inc., 123 F.3d 394, 401 n. 3 (6th Cir. 1997)).[3]

5. Etsy's Transparency and Accountability

The plaintiffs challenge to defendant Dickerson's statement about Etsy's history of transparency and that, as a public company, Etsy would provide "a higher level of transparency and accountability to a broader number of people" is premised on their claims outlined above— that Etsy misled them in various ways. (RAC ¶ 128.) Because those claims fail, their lack of transparency claim also fails. As discussed, the plaintiffs do not adequately allege that these statements were false or misleading. Since they fail to state a claim with respect to the underlying statements, they likewise fail to state a claim regarding a lack of transparency.

Moreover, the defendants openly acknowledged that Etsy faced compliance challenges and that some sellers listed counterfeit goods on the site. The Prospectus warned investors of the "significant risk" that Etsy might not be able to "retain existing members and attract new members" if the company could not maintain the "authenticity of [its] marketplace." (Etsy Prospectus at 6, 16.) The defendants cannot be held liable for failing to disclose something that they disclosed. *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.") (citations omitted).

---

[3] The plaintiffs' reference to Item 303 of Regulation S-K is inapposite. Item 303(a)(3)(ii) requires companies to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income," and Item 303(b)(2) requires disclosure of "any material changes in the registrant's result of operations" from the preceding period. 17 C.F.R. § 229.303(a)(3)(ii), (b)(2). The plaintiffs do not identify undisclosed trends that would have a material impact on Etsy's projections. As discussed, to the extent the plaintiffs refer to infringement as a trend that posed a risk to Etsy's business, the Prospectus sufficiently disclosed that risk.

6. Defendant Dickerson's Post-IPO Statement

The plaintiffs argue that defendant Dickerson made materially false and misleading statements during a May 20, 2015 phone call with investors following the Wedbush Notes, the Morgan Stanley Note, and Etsy's May 2015 Earnings Release. (RAC ¶¶ 137-39.) Specifically, the plaintiffs challenge the following statements:

- [W]e earn respect by following industry leading best practices and establish [sic] law....we strive for a balanced approach that takes into account the interest of our sellers and IP owners and we believe that's working. We at Etsy partner with major brands to address the problem of infringing articles. And in fact we are also accused of being too aggressive in taking down material posted by sellers... (*Id.* ¶ 138.)

- It's certainly true that brand owner[s] complain to us about infringing items appearing on Etsy, but our experience has been that when we engage in a cooperative and transparent way with brand owners we enjoy a productive and beneficial relationship and partnership with those brands. Etsy has a dedicated legal support team that responds to proper takedown notices by properly removing content and providing the Etsy seller an explanation of what happened and the contact information of the notifying party. We also terminate accounts of repeat offenders and we use technology to prevent bad actors from returning to our marketplace. All our practices are based on the Digital Millennium Copyright Act, the Communications Decency Act, the Lanham Act which governs trademark, the Copyright Act, industry best practices and established case law. (*Id.*)

- [W]e strive for a balanced approach that takes into account the interest of our sellers and the IP owners and that we believe it's working. [W]e partnered with major brands to address the problem of infringing articles. And in fact as I said earlier, we're often accused of being too aggressive and taking down material posted by sellers. So Etsy works with brands to influence the technology that we use to proactively locate, take action and prevent bad actors from returning and we continually update that technology because bad actors are always updating their tactics. For security reasons we can't provide detail on to their systems. At the same time, many sellers complain that we go too far in taking down infringing items and closing shops based on our policies. (*Id.*)

These statements are substantially similar to those addressed above, and are inactionable for the same reasons. The statements regarding Etsy's enforcement practices are consistent with the CW reports and the Prospectus. While the plaintiffs may disagree with defendant Dickerson's

statement that he "believe[d]" the compliance system "was working," they have not alleged sufficient facts to suggest that he was deliberately lying. In sum, there is no basis for the argument that any of these statements are false or misleading.

### B. Scienter

As discussed above, to state a cause of action under Section 10(b) or Rule 10b-5, a plaintiff must allege that each defendant acted with scienter. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015). Scienter refers to "a mental state embracing intent to deceive, manipulate, or defraud" investors. *Boca Raton*, 506 F. Appx'x at 38 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 131 S. Ct. 1309, 1323 179 L. Ed. 2d 398 (2011)). To plead scienter, the plaintiffs must establish a "strong inference of fraudulent intent" by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 616 F. App'x 442, 445 (2d Cir. 2015) (citation omitted); *see also Boca Raton*, 506 F. Appx'x at 38 (citing *In re Carter–Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)).[4] When the defendant is a corporation, a plaintiff must plead scienter with respect to "someone whose intent could be imputed to the corporation." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). The plaintiffs fail to plead the requisite scienter; they do not plead recklessness or motive.

---

[4] "[I]n false statement of opinion cases…the falsity and scienter requirements are essentially identical" because "a material misstatement of *opinion* is by its nature a false statement, not about the objective world, but about the defendant's own belief." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004) (emphasis in original). For the reasons discussed above, the plaintiffs have failed to allege scienter with respect to all statements of opinion. *See supra* Discussion Sections II. A. 1-3, 6.

1. Recklessness

The plaintiffs argue that defendants Etsy, Dickerson and Salen acted with conscious recklessness because they were aware of Etsy's infringement problems and the "potentially massive impact" those infringement problems might have "on Etsy's reported performance metrics and financial results." (RAC ¶ 157.) To prove the defendants acted with recklessness, the plaintiffs must plead "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) (citation omitted); *see also In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483–84 (S.D.N.Y. 2006) ("Second Circuit cases uniformly rely on allegations that specific contradictory information was available to the defendants at the same time they made their misleading statements.") (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir. 1994)).

According to the plaintiffs, the CW reports establish that top managers at Etsy were aware of the company's infringement problems, refused to shut down the shops of profitable sellers even if their goods were not handmade,[5] retaliated against an employee for challenging management about these practices, instructed Integrity Team members to hide fraud reports from other employees, and considered but rejected a vetting process that could have reduced the number of infringing items on their site. (RAC ¶ 157.) While these facts would establish that the company and its directors knew about its infringement problems, they do not establish they knew

[5] The plaintiffs allege that Etsy managers instructed Integrity Team members not to shut down the shops of profitable counterfeit sellers (*see* Am. Compl. ¶ 157(h)), but the CW statement upon which they rely does not establish their allegations. Instead, it claims employees were told not to "mess with" a shop that sold "leg warmers and headbands" that would not pass the company's handmade inquiry. *Id.* ¶ 82.

these problems could have an impact on their reported financial results. Thus, the plaintiffs have not pleaded sufficient circumstantial evidence of conscious misbehavior or recklessness.

2. Motive

In the alternative, the plaintiffs argue that the defendants had a motive to lie because they profited from Etsy's IPO. (RAC ¶¶ 160-63.)[6] Motive may be "shown by pointing to 'the concrete benefits that could be realized' from one or more of the allegedly misleading statements or nondisclosures." *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009). This test is "generally met when corporate insiders are alleged to have misrepresented to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." *Id.* (citation omitted). It is not enough, however, "to allege goals that are 'possessed by virtually all corporate insiders, such as the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment..." *Id.* If this Court were to accept that a corporation's general interest in profitability establishes motive to lie, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter."); *see also Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1189-90 (S.D.N.Y. 1996) (a company and its officers and directors always have a "generalized motive to ensure the success" of the company's IPO).

[6] The defendants do not contest that they would have had an opportunity to lie.

The plaintiffs rely on *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266 (S.D.N.Y. 2014) for the proposition that a company's stock offering provides a sufficient motive from which this Court may draw an inference of scienter. In that case, investors alleged that a mining corporation filed two conflicting sets of securities documents that reported the company's mine production quality and quantity: one with Chinese authorities pursuant to a heavily regulated reporting regime and another with the SEC, which "reported much higher yields." 26 F. Supp. 3d at 270-71. To plead scienter, the investors argued that corporation's stock offering provided a sufficient motive. *Id.* at 275.

Unlike this case, however, the Silvercorp investors' complaint also included "extensive allegations of circumstantial evidence of recklessness and misconduct that strongly buttress[ed] the motive alleged, and turn[ed] what might be a weak inference standing alone into a strong one." *Id.* For instance, a newspaper reported that the company worked with Chinese authorities, and "paid for an investigation" into one of the people who brought the alleged discrepancies to light. *Id.* at 275-76. That person was "interrogated, held without charge, had his personal property...confiscated" and paid a "$32,000 unofficial bail (only to be re-imprisoned)." *Id.* Nothing in the plaintiffs' allegations comes anywhere near the *Silvercorp* facts. Because the plaintiffs have not alleged any misconduct that might "turn...[their] weak inference...into a strong one," *Id.* at 275, they have not pleaded scienter with respect to defendants Etsy, Dickerson, Salen, Burns, or Klein.

Likewise, the plaintiffs do not adequately plead scienter with respect to the outside directors, defendants Breyer and Wilson. In addition to the motive discussed above, the plaintiffs allege only that the outside directors were partners in equity firms that sold stock in the IPO.

"[A] conclusory allegation of a defendant's stock ownership," however, does not "provide a sufficient motive without allegations of the specific circumstances of the sales of such shares giving rise to a strong inference of an intent to deceive the investing public." *Geiger*, 933 F. Supp. at 1190 (citing *Acito*, 47 F.3d at 54, *Shields*, 25 F.3d at 1131). "Early Investors and Promoters routinely sells tock in IPOs and such sales raise no inference of fraud." *In re Prestige Brands Holding, Inc.*, No. 05 CV. 06924(CLB), 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006). In short, the plaintiffs fail to plead scienter with respect to any defendant.

**C. The Plaintiffs' Exchange Act Claims Fail**

Since the plaintiffs have not identified any actionable misstatements or adequately alleged scienter, there is no basis upon which they may plead reliance or loss causation. *See, e.g.*, *Boca Raton Firefighters and Police Pension Fund v. Bahash*, 506 F. Appx'x 32, 38 (2d. Cir. 2012). Furthermore, as discussed above, control person liability under Section 20(a) of the Exchange Act depends on a primary violation of Section 10(b). Since the plaintiffs do not allege a violation of Section 10(b), their control person claims fail as well.

**III. Securities Act Claims**

**A. Sections 11 and 12(a)(2) of the Securities Act**

1. Pleading Standard

The plaintiffs claim that all defendants violated Sections 11 and 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77(k), 77*l*(a)(2). Claims under these sections involve "roughly parallel elements." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109–10 (2d Cir. 2011) (citation omitted). Under Section 11, issuers and signatories of a registration statement are liable for material misrepresentations of fact and material omissions of fact. *Id.* (citing 15 U.S.C. § 77k(a)). Under

Section 12(a)(2), issuers and signatories face analogous liability with respect to prospectuses, among other things. *Id.* (citing 15 U.S.C. § 77*l*(a)(2)). Since "fraud is not an element or a requisite to a claim under Section 11 [or 12] ... a plaintiff need allege no more than negligence to proceed." *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir. 2004).

Generally, claims under Sections 11 and 12 are subject to the permissive pleading standard of Rule 8; if a plaintiff's Securities Act claim sounds in fraud, however, the complaint is subject to the heightened pleading requirements imposed by rule 9(b). *Id.* at 170. The plaintiffs argue that the heightened pleading standard does not apply to their Securities Act claims, because they are separately pled and based on a negligence theory. (Opp. at 33.)

In *Rombach v. Chang*, the Second Circuit held that Section 11 claims against corporate officers sounded in fraud because the allegations were explained with words that are "classically associated with fraud." *Id.* at 172. The complaint in that case alleged that the offering statements were "inaccurate *and* misleading" and "contained '*untrue* statements of material facts." *Id.* (emphasis in original). "*Rombach* teaches that when a putative Securities Act claim recites language associated with fraud, incorporates all of the allegations otherwise supporting a fraud claim, and fails to specify a basis for a non-fraud claim, then Rule 9(b) applies." *Lewy v. SkyPeople Fruit Juice*, Inc., No. 11 CIV. 2700 PKC, 2012 WL 3957916, at *8 (S.D.N.Y. Sept. 10, 2012) (citing *Rombach*, 355 F.3d at 171–72). Of course, "plaintiffs may adequately distinguish their Securities Act claims by creating a structural and descriptive separation of those claims from the fraud claims in the same complaint." *Id.* at *9; *see also In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 632 (S.D.N.Y. 2007) (noting that the plaintiffs articulated their

Securities Act claim "in the language of negligence" and set forth their factual allegations in a section called "Defendants' Negligence").

The parties dispute whether the plaintiffs have created a "structural and descriptive separation" between their fraud-based Exchange Act claims and what they purport to be their negligence-based Securities Act claims. While the complaint is not "carefully structured" and does not once use the word negligence, the plaintiffs have attempted to separate their Securities Act claims and employ language that is at least evocative of negligence. *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374 (S.D.N.Y. 2011). For example, they claim that the defendants should have corrected the offering documents "through the exercise of reasonable diligence," that the defendants owed the plaintiffs a "duty to make a reasonable and diligent investigation of the statements" and that the defendants should have "exercise[d] reasonable care." (RAC ¶¶ 191, 196.) Accordingly, the plaintiffs' Securities Act claims are subject to the standard Rule 8 pleading requirements.

2. No Actionable Misstatements or Omissions

An issuer of stock is liable under Sections 11 and 12(a)(2) for any "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011) (citation omitted); *see also Iowa Pub. Emps'. Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 141 (2d Cir. 2010) ("To prevail on a § 11 or § 12(a)(2) claim, a plaintiff must show that the relevant communication either misstated or omitted a material fact.) "The definition of materiality is the same for these Securities Act provisions as it is under section 10(b) of the

Exchange Act: Whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d at 376 (citation omitted).

For the reasons discussed above, the plaintiffs fail to plead that the defendants made material misstatements or omissions even under the liberal standards of Rule 8. *See Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014) (applying liberal pleading standard and dismissing Section 11 claim on the ground that the challenged statements were merely "aspirational puffery"), *aff'd*, 605 F. App'x 52 (2d Cir. 2015); *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 4-5 (2d Cir. 1996) (affirming district court's dismissal of a complaint on the ground that "[t]he prospectuses warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed" and noting that the district court did not reach the question of whether the claim met the 9(b) standard).[7]

**B. Section 15 of the Securities Act**

The plaintiffs claim that the individual defendants violated Section 15 of the Securities Act, 15 U.S.C. § 77o, "which establishes so-called 'control person' liability under the Securities Act." *In re Apple REITs Litig.*, No. 11-CV-2919 KAM, 2013 WL 1386202, at *18–19 (E.D.N.Y. Apr. 3, 2013), *aff'd in part, vacated in part sub nom. Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81 (2d Cir. 2014) (affirming district court's dismissal of the plaintiffs Securities Act claims but remanding for reconsideration of state law claims). Thus, a Section 15 claim depends

[7] The defendants argue that the individual defendants are not "statutory sellers" of Etsy securities and thus the 12(a)(2) claims must be dismissed as to those defendants. (Defendants' Mot. to Dismiss, Dkt. 69 at 39, n. 10.). Because I dismiss the plaintiffs' Securities Act claims in their entirety, I decline to address this question.

upon "a plaintiff's ability to demonstrate primary liability under sections 11 and 12." *Id.* (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010); *Anegada Master Fund, Ltd. v. PXRE Group Ltd.*, 680 F.Supp.2d 616, 624 (S.D.N.Y. 2010)). Since the plaintiffs fail to state a primary violation of Sections 11 and 12(a)(2), they likewise fail to state a claim under Section 15.

**CONCLUSION**

The defendants' motion to dismiss the complaint is GRANTED and the case is DISMISSED with prejudice.

SO ORDERED.

Dated: Brooklyn, New York
March 15, 2016

s/Ann M. Donnelly

ANN M. DONNELLY
United States District Judge